RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0247P (6th Cir.)
File Name: 01a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

V SECRET CATALOGUE, INC.,
VICTORIA'S SECRET STORES,
INC., and VICTORIA'S SECRET
CATALOGUE, INC.,
     *Plaintiffs-Appellees,*

     *v.*

VICTOR MOSELEY and CATHY
MOSELEY, d/b/a VICTOR'S
LITTLE SECRET,
     *Defendants-Appellants.*

No. 00-5320

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00395—Charles R. Simpson III,
Chief District Judge.

Argued: June 14, 2001

Decided and Filed: July 30, 2001

Before: JONES, DAUGHTREY, and COLE, Circuit
Judges.

1

---

**COUNSEL**

---

**ARGUED:** Don A. Pisacano, RAMBICURE, MILLER & PISACANO, Lexington, Kentucky, for Appellants. Frank J. Colucci, COLUCCI & UMANS, New York, New York, for Appellees. **ON BRIEF:** Don A. Pisacano, RAMBICURE, MILLER & PISACANO, Lexington, Kentucky, for Appellants. Frank J. Colucci, COLUCCI & UMANS, New York, New York, for Appellees.

---

**OPINION**

---

MARTHA CRAIG DAUGHTREY, Circuit Judge. Defendants Victor and Cathy Moseley, d/b/a Victor's Little Secret, appeal the district court's grant of summary judgment to the plaintiffs, V Secret Catalogue, Inc., Victoria's Secret Stores, Inc., and Victoria's Secret Catalogue, Inc. (collectively "Victoria's Secret"), on the ground that the Moseleys' use of the name "Victor's Little Secret" for their lingerie and adult toy business constitutes trademark dilution under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c) (2000). The district court granted summary judgment to the Moseleys on federal trademark infringement claims brought by Victoria's Secret, finding that the company had not provided sufficient evidence to establish a likelihood of confusion between the two marks. However, the district court did find that the Victor's Little Secret mark both blurred and tarnished the Victoria's Secret mark under the Federal Trademark Dilution Act (FTDA or "the Act") and, therefore, enjoined the Moseleys from making further use of the Victor's Little Secret mark.

On appeal, the defendants contend that entry of summary judgment resulted from the district court's faulty analysis of the "dilution" question, when reviewed in light of the leading

conclusion, it follows that Victoria's Secret would prevail in a dilution analysis, even without an exhaustive consideration of all ten of the *Nabisco* factors. As did the Second Circuit, we leave their further explication for later development "gradually over time," on a case-by-case basis.

**CONCLUSION**

For the reasons set out above, we AFFIRM the judgment of the district court and thus uphold the grant of summary judgment to the plaintiffs in this case, based upon their claim under the Federal Trademark Dilution Act.

actual consumers who will consider them, and find them persuasive to our analysis.

### 3. Application of the Nabisco test to Victoria's Secret's claim.

As discussed above, the Victoria's Secret mark is quite distinctive, bearing little logical relation to the goods it is used to market, women's lingerie. Thus, it is deserving of a high degree of trademark protection. More importantly, the two marks in question are highly similar. There can be no contesting the fact that "Victoria's Secret" and "Victor's Little Secret" are semantically almost identical (the Moseleys' claim that the marks are "two-thirds different" is particularly unpersuasive). Further, the font used by the Moseleys' mark, the small sizing of the word "little," and its placement above "Victor's Secret" make the marks graphically similar as well.

Although the Moseleys asserted that they were not aware of Victoria's Secret when they named their store, their intent is relevant only to the issue of damages, which are not at issue here. Rather, we must ask whether a consumer would link a store called "Victor's Little Secret" that sold women's lingerie with the more famous Victoria's Secret. We have little doubt that the average lingerie consumer would make just such an association. Assuming that the district court was correct in finding that the sophistication of lingerie consumers and the differences in the quality of the products marketed by the two stores would prevent actual confusion, this is a case that highlights the distinction between an infringement and a dilution claim. While no consumer is likely to go to the Moseleys' store expecting to find Victoria's Secret's famed Miracle Bra, consumers who hear the name "Victor's Little Secret" are likely automatically to think of the more famous store and link it to the Moseleys' adult-toy, gag gift, and lingerie shop. This, then, is a classic instance of dilution by tarnishing (associating the Victoria's Secret name with sex toys and lewd coffee mugs) and by blurring (linking the chain with a single, unauthorized establishment). Given this

case of *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208 (2d Cir. 1999), and from the court's failure to require proof of actual economic loss, as required by *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. Of Travel Dev.*, 170 F.3d 449 (4th Cir. 1999). To the extent that these two recent cases are not entirely consistent in their analysis of the FTDA's requirements, we conclude that the Second Circuit has developed standards that hew most closely to the Act and, applying that court's analysis to the undisputed facts in this case, we conclude that the district court did not err in granting summary judgment to Victoria's Secret on the trademark dilution claim. We therefore affirm the district court's judgment.

### PROCEDURAL AND FACTUAL BACKGROUND

The facts, as considered by the district court and uncontested by the parties, are as follows:

Plaintiff V Secret Catalogue, Inc., is the record owner of the "Victoria's Secret" mark, which has been registered in the United States Patent and Trademark Office since January 20, 1981. V Secret Catalogue licenses Plaintiff Victoria's Secret Catalogue, LLC and Plaintiff Victoria's Secret Stores, Inc. to use the "Victoria's Secret" mark. Victoria's Secret sells a complete line of women's lingerie, as well as other clothing and accessories.

Victoria's Secret Stores operates over 750 stores, and Victoria's Secret Catalogue distributes 400 million copies of the Victoria's Secret catalog each year, including 39,000 in Elizabethtown, Kentucky, where Defendants' store i[s] located. Victoria's Secret's products are also sold over the Internet. Victoria's Secret has two stores in Louisville, Kentucky, within 60 miles of Defendants' store. One store has been open since November 16, 1982; the other since April 24, 1985. In 1998, Victoria's Secret spent over fifty-five million dollars on advertising its products. According to a recent

survey, Victoria's Secret is rated as the ninth most famous brand in the apparel industry.

In February, 1998, Defendants Victor and Cathy Moseley opened "Victor's Secret," a store in a strip mall in Elizabethtown selling a wide variety of items, including men's and women's lingerie, adult videos, sex toys and "adult novelties." The Moseleys assert that they were not aware of Victoria's Secret's catalog or stores until they received a cease and desist letter from counsel for Victoria's Secret on February 25, 1998. The Moseleys subsequently changed the name of their store to "Victor's Little Secret."

Not finding the addition of "Little" to the Victor's Secret mark sufficient to quell its concerns, Victoria's Secret brought suit against the Moseleys in district court, claiming federal trademark infringement, unfair competition under Section 43(a) of the Trademark Act, violation of the Federal Trademark Dilution Act, and common law trademark infringement and unfair competition. Both parties filed motions for summary judgment.

Considering the list of eight factors established in *Frisch's Restaurants, Inc., v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982), the district court found that the Moseleys were entitled to summary judgment on Victoria's Secret's federal infringement claims, because Victoria's Secret had not presented evidence sufficient to create a genuine issue of material fact that a likelihood of confusion existed between the two marks. That ruling is not before us on appeal.

Instead, we are asked to reverse the district court's grant of summary judgment on Victoria's Secret's Federal Trademark Dilution Act claim. In making its ruling, the district court first noted that unlike the standards that must be met to state an infringement claim, "dilution can occur even where the products are not in competition and no likelihood of

these factors weigh in favor of adopting the Second Circuit's test. Most importantly, as the Fourth Circuit again concedes, requiring proof of actual economic harm will make bringing a successful claim under the FTDA unreasonably difficult. With such a broad remedy considered in the Act's legislative history, we find it highly unlikely that Congress would have intended to create such a statute but then make its proof effectively unavailable.

Having determined to follow the *Nabisco* decision, and thus to allow inference of likely harm to the senior mark instead of requiring actual proof, we must now look to the other elements of the *Nabisco* test's definition of dilution. As discussed above, under *Nabisco* a plaintiff must prove that the senior mark is "famous" and "distinctive," that the junior mark is in commercial use, beginning after the senior mark has become famous, and that the junior mark "cause[s] dilution of the distinctive quality of the senior mark." *Nabisco*, 191 F.3d at 215. The Second Circuit has developed a list of ten factors used to determine if dilution has, in fact, occurred, while describing them as a "nonexclusive list" to "develop gradually over time" and with the particular facts of each case. *Id*. at 217. Those factors are: distinctiveness; similarity of the marks; "proximity of the products and the likelihood of bridging the gap;" "interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products;" "shared consumers and geographic limitations;" "sophistication of consumers;" actual confusion; "adjectival or referential quality of the junior use;" "harm to the junior user and delay by the senior user;" and the "effect of [the] senior's prior laxity in protecting the mark." *Id*. at 217-22. These factors are given extensive analysis in the *Nabisco* opinion, which we need not replicate here. We find that these factors effectively span the breadth of considerations a court must weigh in assessing a claim under the FTDA, from the inherent qualities of the marks themselves, to the behavior of the corporate entities in introducing a mark into commerce, to the highly practical and subjective considerations of the effect of the marks on the

the statute to permit adjudication granting or denying an injunction . . . before the dilution has actually occurred." *Id.* at 224-25.

Despite the Fourth Circuit's somewhat persuasive arguments, we conclude that the *Nabisco* test both tracks the language of the statute and follows more closely Congress's intent in enacting the FTDA. Legislative history surrounding the statute's enactment demonstrates that the legislators were attempting to ensure that plaintiffs could find a nationwide remedy for dilution claims, as distinct from the Lanham Act's established protection for trademark infringement. As the Congressional Record indicates, dilution is "an injury that differs materially from that arising out of the orthodox confusion. Even in the absence of confusion, the potency of a mark may be debilitated by another's use. This is the essence of dilution. Confusion leads to immediate injury, while dilution is an infection, which if allowed to spread, will inevitably destroy the advertising value of the mark." H.R. REP. NO. 104-374 (1995), *reprinted in* 1996 U.S.C.C.A.N. 1029, 1032.

This passage is important in two respects. First, it evinces an intent to provide a broad remedy for the lesser trademark violation of dilution and recognizes that the essence of the dilution claim is a property right in the "potency" of a mark. While this does not reach the "property right in gross" proportions of Schechter's early dilution analysis, it does demonstrate an understanding that the right to be protected is in a mark's distinctiveness. Second, the passage's latter half – "confusion leads to immediate injury, while dilution is an infection, *which if allowed to spread*, will inevitably destroy the advertising value of the mark" – evinces an intent to allow a remedy *before* dilution has actually caused economic harm to the senior mark. In such a case, proving actual harm would be extremely difficult, as no such harm would have taken place when the remedy became available, and proof would be limited to the sorts of consumer surveys that the Fourth Circuit itself admits are unwieldy at best. We think that both

confusion is possible." To prove a dilution claim, the district court found that the Act's plain language requires a plaintiff to show that "1) its mark is famous, 2) the defendant is making a commercial use of its mark in commerce, 3) the defendant's use of its mark came after the plaintiff's mark became famous, and 4) the defendant's use of its mark dilutes the quality of plaintiff's mark." (Quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1324 (9th Cir. 1998)). Finding it undisputed that the Victoria's Secret mark is famous, that the Moseleys are engaged in commerce, and that the registration of the Victoria's Secret mark in 1981 long predates the opening of Victor's Little Secret in 1998, the district court found the only element in dispute to be whether the Moseleys' mark diluted Victoria's Secret's.

The district court first found the marks to be sufficiently similar to cause dilution by blurring, noting that the marks' component words are virtually identical, and that the inclusion of "Little" in the Moseleys' mark, in smaller font above the original "Victor's Secret" logo, did little to lessen their similarity.[1] Next, the district court found that the Moseleys' mark had a tarnishing effect upon the Victoria's Secret mark, in that "included in the inventory sold by the Moseleys, in addition to lingerie, are adult videos as well as sex toys and other 'adult novelties.'" The court concluded that "while the Defendants' inventory may not be unsavory to all, its more risque quality widely differentiates it from that of the Plaintiffs." Finding this evidence sufficient to support a dilution claim, the district court granted summary judgment to Victoria's Secret and enjoined the Moseleys from using the Victor's Little Secret mark. Since the issuance of the district

_____

[1] In their appeal to this court, the Moseleys argue that the district court conducted its dilution analysis on the wrong mark, namely "Victor's Secret" instead of "Victor's Little Secret." This argument is patently without merit, as the district court plainly took into account the Moseleys' attempt to change their mark after receiving a cease and desist letter from Victoria's Secret and found it not to alter significantly the dilution of Victoria's Secret's mark.

court's order, the Moseleys have successfully operated their business as "Cathy's Little Secret," apparently without objection from Victoria's Secret. The Moseleys nevertheless bring this appeal from the grant of summary judgment in the district court.

### DISCUSSION

Prior to the passage of the Federal Trademark Dilution Act in 1995, actions for trademark dilution were limited to those brought in the 25 states that had enacted dilution statutes, and the standards for finding dilution varied widely between jurisdictions. *See* 104-374 (1995), 1996 U.S.C.C.A.N. 1029, 1032. The FTDA was crafted "because famous marks ordinarily are used on a nationwide basis and dilution protection is currently only available on a patch-quilt system of protection . . . Further, court decisions have been inconsistent and some courts are reluctant to grant nationwide injunctions for violation of state law where half of the states have no dilution law." *Id*. The FTDA provides that:

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection. In determining whether a mark is distinctive and famous, a court may consider factors such as, but not limited to:

(A) the degree of inherent or acquired distinctiveness of the mark;

(B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

If the famous senior mark were being exploited with continually growing success, the senior user might never be able to show diminished revenues, no matter how obvious it was that the junior use diluted the distinctiveness of the senior. Even if diminished revenue could be shown, it would be extraordinarily speculative and difficult to prove that the loss was due to the dilution of the mark. And as to consumer surveys, they are expensive, time-consuming and not immune to manipulation.

*Id*. at 224. The court further observed that "[p]laintiffs ordinarily agree to make their case through circumstantial evidence that will justify an ultimate inference of injury. [C]ontextual factors have long been used to establish infringement. . . . We see no reason why they should not be used to prove dilution." *Id*.

The Second Circuit in *Nabisco* found that the broader reading of the Fourth Circuit's opinion, requiring both actual proof and that the junior mark be established in the marketplace, "depends on excessive literalism to defeat the intent of the statute." The court held that "[t]o read the statute as suggested by the *Ringling* opinion would subject the senior user to uncompensable injury. The statute could not be invoked until injury had occurred. And, because the statute provides only for an injunction and no damages (absent willfulness), such injury would never be compensated." *Id*. The court also remarked that such a reading would be disastrous for a junior mark's owner who wanted to test the propriety of a new mark before launching it in the marketplace. Under this reading of the FTDA, the junior mark's owner would not be able to know that her mark was improper until she had already spent the resources involved in establishing a trademark in consumers' minds. *See id*. The *Nabisco* court concluded, "We are not at all sure that the *Ringling* opinion intends to limit the application of the statute to dilution that has already occurred, as opposed to the narrower reading discussed above. . . . In any event, we read

plain meaning of the statute. There is a key difference between the state antidilution statutes that formed the backdrop for passage of the FTDA and the FTDA itself. Whereas state antidilution statutes incorporate, often expressly, the "likelihood of dilution" standard, the federal statute does not . . . . Instead, it prohibits any commercial use of a famous mark that "causes dilution." 15 U.S.C. § 1125(c)(1). Both the present tense of the verb and the lack of any modification of "dilution" support an actual harm standard.

*Id.* at 670.

### 2. Inference of Likely Harm: *Nabisco, Inc. v. PF Brands, Inc.*

The Second Circuit explicitly rejected the Fourth Circuit's actual harm test in *Nabisco, Inc. v. PF Brands, Inc.*, finding that a different interpretation of the FTDA's language must prevail. In so doing, the Second Circuit found two possible readings of the *Ringling Brothers* opinion. "The narrower position would be that courts may not infer dilution from 'contextual factors (degree of mark and product similarity, etc.),' but must instead rely on evidence of 'actual loss of revenues' or the 'skillfully constructed consumer survey." *Nabisco*, 191 F.3d at 223. "The broader reading of the Fourth Circuit's 'actual, consummated' dilution element would require not only that dilution be proved by a showing of lost revenues or surveys but also that the junior be already established in the marketplace before the senior could seek an injunction." *Id.* at 224. This view finds footing in the fact that the statute provides a remedy for a junior mark that "causes dilution," as opposed to state statutes which had prevented "likelihood of dilution." *See id.*

The court ultimately rejected both readings of the Fourth Circuit's opinion. It found the narrow reading to be "an arbitrary and unwarranted limitation on the methods of proof" and reasoned:

(C) the duration and extent of advertising and publicity of the mark;

(D) the geographical extent of the trading area in which the mark is used;

(E) the channels of trade for the goods or services with which the mark is used;

(F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;

(G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1).

The Act further defines "dilution" as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood or confusion, mistake, or deception." 15 U.S.C. § 1127. Courts have not made a uniform application of the FTDA, however, individual circuits having applied a different set of standards to arising claims, many of which seem to blur the distinction between proving likelihood of confusion in a traditional infringement claim and proving trademark dilution. *See* 4 McCarthy on Trademarks and Unfair Competition § 24:94 (2000).

### A. Analysis of the FTDA's preliminary factors.

In our most recent FTDA decision, *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562 (6th Cir. 2000), decided some two months after entry of the district court's opinion in this case, we adopted the Second Circuit's standards for determining dilution set out in *Nabisco*, 191 F.3d at 215. The *Nabisco* test

requires that to establish a dilution claim, "(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark." *Kellogg*, 209 F.3d at 577 (quoting *Nabisco*, 191 F.3d at 215). Without the benefit of our opinion, the district court instead applied a four-factor test for dilution established by the Ninth Circuit in *Panavision*, 141 F3d at 1324. The *Panavision* test requires a plaintiff to prove that "1) the mark is famous; (2) the defendant is making a commercial use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark dilutes the quality of the mark by diminishing the capacity of the mark to identify and distinguish goods and services." *Id*. The two tests are substantially similar, with the only material difference being that the *Kellogg / Nabisco* test requires a plaintiff to prove that its mark is not only famous, but also distinctive.

Although in *Kellogg* we did not conduct a full dilution analysis, the Second Circuit provided an extended discussion of distinctiveness in the *Nabisco* decision, as follows:

> Distinctiveness in a mark is a characteristic quite different from fame. Distinctiveness is a crucial trademark concept, which places marks on a ladder reflecting their inherent strength or weakness. The degree of distinctiveness of a mark governs in part the breadth of the protection it can command. At the low end are generic words – words that name the species or object to which the mark applies. These are totally without distinctiveness and are ineligible for protection as marks because to give them protection would be to deprive competitors of the right to refer to their products by name. . . . Thus, no one can claim the exclusive right to use the mark "CAR" for a car. One rung up the ladder are "descriptive" marks – those that *describe* the product or its attributes or claims. These also have little

The *Ringling Brothers* court then faced the question of how a plaintiff might prove a "lessening of the capacity of a famous mark to identify and distinguish goods or services." The court conceded that "the difficulties of proving actual dilution by practically available means is [sic] evident," but found "that proof of actual dilution cannot be considered impossible and therefore not possibly what Congress could have intended. Proof will be difficult, because actual, consummated dilutive harm and its cause are difficult concepts. But the concept is a substantively viable one, and the means of proof are available." *Id*. at 464. The court then established three forms of proof it would find acceptable:

> Most obviously, but most rarely, there might be proof of an actual loss of revenues, and proof of replicating use as cause by disproving other possible causes. Most obviously relevant, and readily available, is the skillfully constructed consumer survey designed not just to demonstrate "mental association" of the marks in isolation, but further consumer impressions from which actual harm and cause might rationally be inferred . . . Finally, relevant contextual factors such as the extent of the junior mark's exposure, the similarity of the marks, the firmness of the senior mark's hold, are of obvious relevance as indirect evidence that might complement other proof.

*Id*. at 465. Finding that Ringling Brothers had not produced evidence to meet any of these standards, the court held that it had not sufficiently proved dilution.

The Fourth Circuit's actual harm standard was subsequently adopted by the Fifth Circuit in *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658 (5th Cir. 2000). In that case, the Fifth Circuit held:

> As an issue of first impression in this Circuit, we endorse the Fourth Circuit's holding that the FTDA requires proof of actual harm since this standard best accords with the

be proved, and that such harm could occur despite the absence of any consumer confusion . . . Though not expressed in those exact procedural terms, the suggestion was effectively that proof must and could be sought through the normal judicial process of fact-finding by inference from a set of contextual factors (degree of mark and product similarity, etc.) that he proposed as relevant for the purpose."[5] *Ringling Bros.*, 170 F.3d at 457. Finally, the court found that "some courts have taken the position, in part at least for the very reason that they consider likelihood of harm to a mark's selling power to be incapable of direct or inferential proof, that it may simply be presumed from the identity or sufficient similarity of the marks." *Id.*

The Fourth Circuit then cast the FTDA against this history of state statute interpretation, finding two aspects of its construction to be particularly relevant. "Most critically, the federal Act proscribes and provides remedy only for actual, consummated dilution and not for the mere 'likelihood of dilution' proscribed by the state statutes. And, by specifically defining dilution as 'the lessening of the capacity of a famous mark to identify and distinguish goods or services,' the federal Act makes plain what the state statutes arguably may not: that the end harm at which it is aimed is a mark's selling power, not its 'distinctiveness' as such." *Id.* at 458. The court found its "concededly . . . stringent" definition of dilution, requiring "an actual lessening of the senior mark's selling power, expressed as 'its capacity to identify and distinguish goods or services'" to follow from these points. *Id.* To hold otherwise, the court asserted, would be to find a "property right in gross" in a mark's distinctiveness, and to rely upon judicial presumption where actual proof should be required. *Id.* at 459-60.

---

[5]The *Mead Data Central* case, while frequently cited in dilution commentary for the factors established by Judge Sweet, was a Second Circuit case applying New York State's dilution law. Accordingly, it is of only marginal comparative relevance to FTDA analysis, and has been largely discredited by the courts in interpreting the federal Act.

distinctiveness and accordingly are ineligible for protection unless they have acquired "secondary meaning" – that is, unless the consuming public has come to associate the mark with the products or services of its user . . . . [T]he next higher rung belongs to "suggestive" marks; these fall in an in-between category. . . . They do not name or describe the product for which they are used, but they suggest the qualities or claims of that product. They are more distinctive than descriptive marks, and thus are accorded trademark rights without need to demonstrate that consumers have come to associate them with the user of the mark . . . . Nonetheless, because they seek to suggest qualities of the product, they possess a low level of distinctiveness. The are given less protection than is reserved for more distinctive marks – those that are "arbitrary" or "fanciful." . . . A mark is arbitrary or fanciful if there is no logical relationship whatsoever between the mark and the product on which it is used. However, even within the category of arbitrary or fanciful marks, there is still a substantial range of distinctiveness. Some marks may qualify as arbitrary because they have no logical relationship to the product, but nonetheless have a low level of distinctiveness because they are common. The most distinctive are marks that are entirely the product of the imagination and evoke no association with human experience that relate intrinsically to the product . . . . The strongest protection of the trademark laws is reserved for these most highly distinctive marks.

*Nabisco*, 191 F.3d at 215-16 (citations omitted).

The Second Circuit went on to note that it took the requirement that a mark be distinctive from the text of the FTDA, which requires that the junior mark's use must cause "dilution of the distinctive quality of the [plaintiff's] mark" and lists as a factor to be considered "whether the mark is distinctive and famous." *Id.* at 216. Finally, the Second Circuit concluded that:

The requirement of distinctiveness is furthermore an important limitation.  A mark that, notwithstanding its fame, has no distinctiveness is lacking the very attribute that the antidilution statute seeks to protect.   The antidilution statute seeks to guarantee exclusivity not only in cases where confusion would occur but throughout the realms of commerce.  Many famous marks are of the common or quality-claiming or prominence-claiming type – such as American, National, Federal, Federated, First, United, Acme, Merit or Ace.  It seems most unlikely that the statute contemplates allowing the holders of such common, albeit famous, marks to exclude all new entrants.  That is why the statute grants that privilege only to holders of distinctive marks.

*Id.*

Because it applied the *Panavision* test instead of the test derived from *Nabisco*, the district court did not explicitly consider the distinctiveness of the Victoria's Secret mark as a factor of the plaintiffs' prima facie case, and the Moseleys now contend (albeit in a different context) that the mark is not distinctive.[2]  They argue that because there are "hundreds" of lingerie concerns that use the word "secret" as part of their mark, it cannot be considered an arbitrary or fanciful term deserving a high level of protection.  In this argument, however, the defendants err by failing to consider the Victoria's Secret mark as a whole.  For in the context of considering two marks' similarity, we have "endorsed the 'anti-dissection rule,' which serves to remind courts not to

---

[2]As noted by the Second Circuit in *Nabisco*, analysis of a mark's distinctiveness serves two functions.  First, it is a statutory element. Second, "the *degree* of distinctiveness of the senior mark has a considerable bearing on the question whether a junior use will have a diluting effect." *Nabisco*, 191 F.3d at 217.  It is in the context of this second use that the Moseleys make their distinctiveness arguments in their brief to this court.

The court then looked to the Restatement (Third) of Unfair Competition for a summary of how these various statutes were applied by the state courts.  The court noted the "sheer difficulty that courts have had in getting a firm handle on the basic concept of 'dilution' as cryptically expressed in the typical state statute by an unelaborated reference to 'dilution of the distinctive quality of a mark.'" *Id.* at 455.  Attempting to synthesize the state court decisions, the Fourth Circuit found:

> [Al]though the typical state statute formulation is susceptible to an in-gross-property-right interpretation–by reading "distinctive quality" as essentially synonymous with "uniqueness" in the Schechter model[,] no court seems to have taken that blunt approach.  Instead, frequently alluding to Schechter's identification of the senior mark's "selling power," and the "whittling away" of that power as the ultimate concerns of dilution's special protective function, the courts seem generally to have assumed that loss of that power, and the economic value it represents, was the end harm at which the antidilution statutes were aimed.

*Id.* at 456.

The Fourth Circuit recognized that the true interpretive problem with the state court decisions had been how that loss of power and economic value could be proved. *See id.* at 457.  The court found three general approaches.  First, "during the period of general judicial hostility to the whole statutory dilution concept . . . some courts, seeming to assume that the requisite harm could only be shown by evidence of some form of product-diverting consumer confusion (presumably other than source confusion), invariably found such proof lacking." *Id.*  A second approach, delineated by Judge Sweet in his concurring opinion in  *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026 (2nd Cir. 1989), "assumed both that likelihood of harm to selling power must

association of the two that (2) causes (3) actual harm to the senior marks' economic value as a product-identifying and advertising agent." *Id.* at 453.

The Fourth Circuit in *Ringling Brothers* conceded that an actual harm requirement "does not leap fully and immediately from the statutory text," but nevertheless found it to lie in the statute's legislative history. *Id.* The court traced the origin of modern dilution law to Frank Schechter's seminal article, *The Rational Basis of Trademark Protection*, 40 HARV. L. REV. 813 (1927), in which Schechter argued that the true harm of diluting junior marks was not consumer confusion but "the gradual whittling away or dispersion of the identity and hold upon the public mind of the mark or name by its use upon non-competing goods." *Id.* at 825. The court termed this theory "radical" and "extreme," and stated that "there was no legislative adoption of the concept in any form until 1947 when Massachusetts enacted the first state 'antidilution' statute." *Ringling Bros.*, 170 F.3d at 454. However, as the court notes, 25 states followed the lead of Massachusetts in the years preceding adoption of the FTDA, and adopted modified versions of Schechter's proposal as state antidilution law. *See id.* The court found that:

> Though they of course varied in detail, the state statutes typically had four features of relevance for our interpretive purposes: (1) they defined the category of marks protected against dilution solely by reference to their "distinctive quality"; (2) they proscribed not just actual, consummated dilution, but the "likelihood of dilution"; (3) by containing no express reference to harm to the senior mark's economic value, they defined dilution in terms susceptible to the interpretation that it consisted solely of a loss of the mark's distinctiveness; and (4) they provided only injunctive relief.

*Id.*

focus only on the prominent features of the mark, or only on those features that are prominent for purposes of the litigation, but on the mark in its totality." *Jet, Inc. v. Sewage Aeration Systems*, 165 F.3d 419, 423 (6th Cir. 1999). Obviously, the anti-dissection rule is equally applicable in considering a mark's distinctiveness.

In this case, for example, although the word "secret" may provoke some intrinsic association with prurient interests, it is not automatically linked in the ordinary human experience with lingerie. "Secret" is not particularly descriptive of bras and hosiery. Nor is there anything about the combination of the possessive "Victoria's" and "secret" that automatically conjures thoughts of women's underwear – except, of course, in the context of plaintiff's line of products. Hence, we conclude that the "Victoria's Secret" mark ranks with those that are "arbitrary and fanciful" and is therefore deserving of a high level of trademark protection. Although the district court applied a slightly different test from the one now established in this circuit, the court would undoubtedly have reached the same result under the *Nabisco* test. Certainly, we cannot say that the court erred in finding that the preliminary factors of a dilution claim had been met by Victoria's Secret.

**B.  Analysis of dilution.**

In this case, the Moseleys do not challenge the fact that the Victoria's Secret mark is famous, nor do they dispute that they are using their "Victor's Little Secret" mark in commerce and began doing so after the Victoria's Secret mark became famous. The only element at issue, therefore, is whether their mark dilutes that of Victoria's Secret. As noted above, the FTDA defines dilution as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (1) competition between the owner of the famous mark and other parties, or (2) likelihood or confusion, mistake, or deception." 15 U.S.C. § 1127. In applying these terms, the circuits have not adopted a uniform approach, instead applying a somewhat

amorphous set of factors to each particular case. *See*, *e.g.*, *Nabisco*, 191 F.3d at 217 (advocating the adoption of a "cautious and gradual approach" to developing factors to determine dilution). The Sixth Circuit has not yet conducted a full analysis of a dilution claim under the FTDA and, thus, has not articulated the standards it will apply in determining whether a junior mark causes dilution. That task now falls to us.

The district court, in analyzing Victoria's Secret's claim, found that:

> Dilution corrodes a trademark by "blurring its product identification or by damaging positive associations that have attached to it." [*Panavision*, 141 F.3d at 1324.] Dilution through tarnishing that may create a negative association with the goods or services covered by the senior mark." *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. Of Travel Dev.*, 955 F.Supp. 605, 614 (E.D.Va. 1997). In order to dilute a more senior mark, the junior mark must be sufficiently similar. We find that Defendants' mark is sufficiently similar to Plaintiffs' mark in order to cause dilution.[3]

The district court went on to find that "Defendants' mark dilutes Plaintiffs' mark because of its tarnishing effect upon the Victoria's Secret mark . . . . While the Defendants' inventory may not be unsavory to all, its more risque quality widely differentiates it from that of the Plaintiffs."

---

[3]The Moseleys argue that the district court erred in finding the marks "sufficiently similar." The Moseleys assert that the marks must be found to be "substantially similar." However, as held in *Nabisco*, the requirement is that "[t]he marks must be of sufficient similarity so that, in the mind of the consumer, the junior mark will conjure an association with the senior." Measured by this standard, there can be little doubt that "Victor's Little Secret" does, in fact, conjure an association with the "Victoria's Secret" mark.

In reviewing the district court's truncated dilution analysis, we must now decide which factors are relevant to the determination of a dilution claim under the FTDA. Although the tests adopted by other circuits vary in the level of detail they apply to the claims, the qualities these tests consider are essentially the same. However, a split has developed among the circuits with respect to one crucial element: whether a plaintiff must prove actual, present injury to its mark to state a federal dilution claim. The leading cases are *Ringling Brothers*, 170 F.3d at 458, in which the Fourth Circuit held that a plaintiff must provide evidence of actual, present injury to the famous mark, and *Nabisco*, in which the Second Circuit explicitly rejected the Fourth Circuit's more stringent approach. Thus, in reviewing the present case, we must determine, first, which factors will be taken into account in determining if dilution of a mark has occurred, and second, whether to require a plaintiff to present evidence of actual harm to its famous mark, aligning ourselves with either the *Ringling Brothers* or the *Nabisco* line of cases.[4]

1. **The Actual Harm Requirement: *Ringling Bros.-Barnum & Bailey v. Utah Division of Travel Development.***

In *Ringling Brothers*, the circus moguls contended that the State of Utah's use of the slogan "the greatest snow on earth" diluted their famous mark, "the greatest show on earth." *See Ringling Bros.*, 170 F.3d at 451. Analyzing Ringling Brothers' claims under the FTDA, the Fourth Circuit found that "'dilution' under the federal Act consists of (1) a sufficient similarity of marks to evoke in consumers a mental

---

[4]In *Kellogg*, we did not have the occasion to engage in a full analysis of the dilution claim presented in that case, citing *Nabisco* for its determination of the elements of a dilution claim, but also citing *Ringling Brothers*, presumably as a comparable source of the elements for a dilution claim. As *Nabisco* and *Ringling Brothers* are in direct conflict on the issue of proof of actual harm, we must now resolve the apparent contradiction.