**AUTOZONE, INC. and Speedbar, Inc., Plaintiffs,**

v.

**TANDY CORPORATION, Defendant.**

**No. 3:99–0884.**

United States District Court, M.D. Tennessee, Nashville Division.

Nov. 9, 2001.

October 4, 2001.

Walter Henry Crouch, Waller, Lansden, Dortch & Davis Nashville, TN, Alan S. Cooper, Ralph A. Taylor, Jr., Eric T. Fingerhut, Rett V. Snotherly, Shaw Pittman, Washington, DC, for Plaintiffs.

D'Lesli M. Davis, Nels D. Jacobson, Jr., King & Ballow, Nashville, TN, Jane Michaels, Timothy P. Getzoff, Holland & Hart, Denver, CO, for Defendant.

## MEMORANDUM

WISEMAN, Senior District Judge.

Plaintiffs AutoZone, Inc. and Speedbar, Inc. (together "AutoZone" or "Plaintiffs") bring this action against defendant Tandy Corp. ("Tandy" or "Defendant"). The complaint sets forth five claims: (1) service mark and trademark infringement; (2) trade name infringement; (3) breach of contract; (4) unfair competition; and (5) service mark and trademark dilution. Defendant moves for summary judgment on each of Plaintiffs' claims. For the following reasons, Defendant's motion is GRANTED in its entirety.

### I. Relevant Facts

In 1979, AutoZone's predecessor, Malone & Hyde, Inc. ("M & H"), began business using the trade name Auto Shack. In 1982, Tandy sued M & H in this Court for trademark infringement and dilution of its Radio Shack marks.[1] On December 15, 1986, the parties settled the earlier litigation. As part of the settlement agreement, M & H agreed to use the replacement name AutoZone.

AutoZone alleges that it adopted the AutoZone name, alone and in combination with the Speedbar Design, for retail auto parts store services. Plaintiffs also use AUTOZONE as a brand name on certain automotive parts and accessories. AutoZone alleges that it has continuously used these marks in connection with advertising, marketing, and sales of its goods and services within interstate commerce and within the state of Tennessee since 1987. AutoZone registered the AUTOZONE mark and the AUTOZONE & Speedbar Design with the United States Patent and Trademark Office and registrations subsequently issued. The registrations were transferred to Speedbar, Inc. as of May 10, 1998. Speedbar then licensed the use of the marks to AutoZone for use in connection with the rendering and promotion of retail auto parts store services, as well as automotive parts and accessories.

On July 2, 1998, Tandy began using the mark POWERZONE to identify a section inside its Radio Shack stores where batteries, extension cords, converters, and other power-related accessories are sold.

On February 1, 1999, AutoZone requested that Tandy cease using the POWERZONE mark and abandon its application to register the mark. When Tandy ultimately refused to comply with the request, AutoZone commenced this action.

### II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323, 106 S.Ct. 2548. In responding to a motion for summary judgment, the

---

1. This Court held that the 32–month delay in notifying M & H of the objection to the AUTO SHACK mark was "inexcusable and unreasonable," and that the delay had substantially prejudiced M & H. The Court therefore granted summary judgment for Defendant M & H on the basis of laches. On appeal, the Sixth Circuit reversed on the ground that this Court had not considered the applicable three year Tennessee statute of limitations for tortious injury to property in its application of the doctrine of laches. As noted, the parties subsequently settled.

nonmoving party cannot rest on its pleadings, but must present some "specific facts showing that there is a genuine issue for trial." *Id.*

The Supreme Court concluded in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), that a dispute about a material fact is 'genuine' within the meaning of Rule 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient." *Id.* Of course, the Court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *See id.* at 261, 106 S.Ct. 2505.

### III. Discussion

 Trademark infringement, trade name infringement, and unfair competition claims all employ a "likelihood of confusion" analysis as the basic test to determine liability. *See e.g., Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 288 (6th Cir. 1997) ("*Daddy's* "). In addition, Auto-Zone's breach of contract claim in this case stems from Tandy's use of an allegedly confusingly similar mark. Finally, a valid dilution claim requires greater similarity between the marks than for a trademark infringement claim. *See Jet, Inc. v. Sewage Aeration Systems,* 165 F.3d 419, 425 (6th Cir.1999). As a result, the dispositive issue in this case is proof of likelihood of confusion between the AUTOZONE and POWERZONE marks. AutoZone and Tandy have concentrated their arguments on the factors to be considered by the Court in determining whether a likelihood of confusion exists. The Court, therefore, focuses its analysis on the likelihood of confusion issue.

### A. Trademark Infringement

 In *Daddy's,* the Sixth Circuit set forth the elements necessary to succeed on a claim of trademark infringement. 109 F.3d at 280. The touchstone of liability under 15 U.S.C. § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties. When determining whether a likelihood of confusion exists, a court must examine and weigh the following eight factors: (1) similarity of the marks; (2) strength of the senior mark; (3) relatedness of the goods or services; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *See id.* These factors "imply no mathematical precision, but are simply a guide to determine whether confusion is likely ... and not all of these factors may be particularly helpful in a given case." *Data Concepts, Inc. v. Digital Consulting, Inc.,* 150 F.3d 620, 624 (6th Cir.1998) ("*Data Concepts* ").

 Whether a likelihood of confusion exists is a mixed question of law and fact. *See id.* at 624. To defeat a motion for summary judgment in a trademark infringement case where likelihood of confusion is the dispositive issue, "a nonmoving party must establish, through pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, that there are genuine factual disputes concerning those of the eight factors which may be material in the specific case." *See Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir.1991) ("*Homeowners Group* "). The Sixth Circuit has since clarified *Homeowners Group* by stating that "the nonmoving party's burden is to

identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." *Marketing Displays, Inc. v. Traf-Fix Devices, Inc.*, 200 F.3d 929, 934 (6th Cir.1999), *rev'd on other grounds*, 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (Mar. 20, 2001).

### 1. Similarity of the Marks

■ The similarity of the marks is a factor of considerable weight. *See Daddy's*, 109 F.3d at 283. In determining the degree of similarity, courts examine a mark's overall impression, including the "pronunciation, appearance, and verbal translation." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir.1988) ("*Wynn Oil*"). A side-by-side comparison is not the test. *See id.* Instead, "the marks must be viewed in their entirety and in context." *Homeowners Group*, 931 F.2d at 1109. Where the goods and services at issue are directly competitive, the degree of similarity of the marks needed to cause confusion is less than in the case of dissimilar goods and services. *See Union Carbide Corp. v. Ever–Ready, Inc.*, 531 F.2d 366 (7th Cir.1976).

#### a. Verbal Similarities

Tandy contends that a descriptive or common term has little effect on the likelihood of confusion analysis and may even be deleted when comparing the marks. Tandy points to *Little Caesar Enterprises v. Pizza Caesar, Inc.*, in which the Sixth Circuit found that PIZZA CAESAR USA and LITTLE CAESAR were not similar because the common term "Caesar" was frequently used and did little to indicate source. 834 F.2d 568, 570–71 (6th Cir. 1987). In addition, the Sixth Circuit in *Induct–O–Matic Corp. v. Inductotherm Corp.* concluded that the term "Matic" should be deleted before comparing the marks because it was descriptive and did nothing to distinguish the marks. 747 F.2d 358, 363–64 (6th Cir.1984). Tandy argues that because of the common and widespread usage of the "zone" component of the marks, that portion should be deleted or de-emphasized when comparing the marks.

■ The general rule, however, is that composite marks should be compared by looking at them as a whole, rather than breaking up the marks into their component parts for comparison. *See* McCarthy on Trademarks and Unfair Competition § 23:41 (4th ed. 2001) ("McCarthy"). This is known as the "anti-dissection" rule. The rationale for the rule is that the commercial impression of a composite trademark on an ordinary prospective purchaser is created by the mark as a whole, and that a purchaser would not evaluate all of the individual details of a composite mark. At least one court stated that it was improper to find that one portion of a composite mark has no trademark significance, leading to a direct comparison between only what remained. *See Spice Islands, Inc. v. Frank Tea & Spice Co.*, 505 F.2d 1293 (Cust. & Pat.App.1974). To summarize: while this Court may not ignore or delete the "zone" portion when making the comparison, it is appropriate to consider the common nature of that portion.

#### b. Visual Similarities

AutoZone contends there are visual similarities between the marks. For example, AUTOZONE is displayed as a single, unitary word with capital letters "A" and "Z" and combined with a slanting broken line design. POWERZONE is similarly displayed as a single, unitary word with capital letters "P" and "Z" joined with a slanting broken line design.

Tandy points out the visual distinctions between the two designs. For example, it

notes that Tandy's mark has same-sized lines placed before and after the text, while the AUTOZONE mark has bars of decreasing thickness. The word "Power-Zone" is always centered within the design while "AutoZone" is placed to one side. In addition, "AutoZone" is written in slanted text and. "PowerZone" is written in straight text. Finally, when color is available, AutoZone's design is in red and orange, while the PowerZone is always in black and white.

### c. Similarity in Marketplace Usage

AutoZone argues that the marketplace environment where POWERZONE is found compounds the confusion caused by the similarity. The "store within a store" concept has been used within Radio Shack stores to grant various manufacturers product distribution points, including signage and other advertising indicia. Examples of the "store within a store" concept include the SPRINT Communications Store, RCA Digital Entertainment Center, MICROSOFT Information Center, and COMPAQ Learning Center. AutoZone argues that the exposure to prominent displays of other companies' brand names makes it more likely that consumers will erroneously assume that POWERZONE is associated with some other company. Autozone contends that the obvious choice for such an association would be AutoZone.

Tandy counters by stating that if it intended to cause a connection with Auto-Zone in consumers' minds, it would have used the AUTOZONE mark itself, just as it has done with its other partners. To further emphasize the differences in the marks as viewed in the marketplace, Tandy points out that its POWERZONE mark is always used in conjunction with its RADIO SHACK house mark. Customers perceiving the POWERZONE mark will view it either inside a Radio Shack store or in conjunction with a Radio Shack advertisement. In either case, Tandy asserts that the use of POWERZONE together with RADIO SHACK further distinguishes the marks and makes confusion less likely.

### d. Conclusion

The Court finds that the marks AUTO-ZONE and POWERZONE are sufficiently verbally different to make confusion unlikely. Most consumers, when viewing these two marks, would tend to de-emphasize the "zone" portions because of their common usage. This analysis is in keeping with the guidance of the Sixth Circuit in *Daddy's,* where the court instructed the district court to evaluate how the common nature of the phrase "Daddy's" affected the strength of the plaintiff's marks. *See Daddy's,* 109 F.3d at 282. In addition, the most prominent portion of each mark is not the shared "zone" portion but the initial syllables. *Accord Jet,* 165 F.3d at 423.

Despite their verbal differences, there are similarities in the appearances of the marks. For example, both marks use slanting lines and similar capitalization. As the anti-dissection rule dictates, however, each mark must be viewed as a whole. Courts have recognized that "otherwise similar marks are not likely to be confused if they are used in conjunction with clearly displayed names, logos, or other source-identifying designations." *International Association of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.,* 103 F.3d 196, 204 (1st Cir.1996). When viewed in their entirety, the use of the RADIO SHACK house mark in conjunction with the POWERZONE substantially lessens any possibility of consumer confusion regarding an association between the companies. Because of the verbal and visual differences between the marks, the similarity factor weighs against a finding of likelihood of confusion.

### 2. Strength of the AUTOZONE Mark

"The strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, more protection is due." *Daddy's,* 109 F.3d at 280. In general, an incontestable mark is presumed to be a strong mark. *See Wynn Oil,* 943 F.2d at 600. A mark becomes incontestable if it is not successfully challenged within five years of registration. *See* 15 U.S.C. § 1065. The presumed strength of an incontestable mark is rebuttable by a showing of third party use. *See Data Concepts,* 150 F.3d at 624–25.

In this case, Plaintiffs' AUTOZONE mark is incontestable and thus presumed strong for retail auto parts store services. For purposes of summary judgment, Tandy does not dispute that AUTOZONE is a strong mark for retail auto parts and services. However, Tandy argues that the Court should consider the evidence of "extensive" third-party use of "zone" trademarks when assessing Plaintiffs' right to "zone" trademarks other than AutoZone. Tandy argues that irrespective of AUTOZONE's strength as a mark within its industry, it is weak in the context of other "zone" marks that are used outside of automotive products.

Tandy notes that there were 745 active trademarks registered with the Patent and Trademark Office that use or incorporate the word "zone." Tandy argues that these third-party registrations are probative evidence that "zone" marks are widely used by others in the marketplace. Tandy observes that of these "zone" trademarks, one is for the nearly identical mark, AUTO–ZONE, registered for controls for heating, ventilation, and air conditioning systems not for automotive use. Wattmaster Company has been using their AUTO–ZONE mark since 1991 and is currently using it on their web page.

Tandy also notes that several of the registered "zone" marks are for automotive-related goods or services. It contends that the extensive third party use, evidenced by registrations and use on the Internet, demonstrates that Plaintiffs cannot claim a monopoly on the term "zone," especially on unrelated goods or services.

Next, Tandy argues that AutoZone has not been diligent in protecting its mark against the extensive third party use. Tandy suggests that many of AutoZone's enforcement efforts against these marks were prompted by this litigation.

AutoZone replies with evidence of the strength of the AUTOZONE mark. AutoZone claims that its consumer survey conducted by Michael Rappeport is direct evidence of the strength of its mark. Indeed, in his deposition, Dean Rose, AutoZone's Senior Vice President for Advertising, stated that the survey was directed "to the issue of the strength of the plaintiffs' mark." As noted, however, Tandy concedes that AUTOZONE is strong in the context of the automotive parts and services industry.

In citing the numerous examples of third party registrations for "zone" marks, AutoZone contends that Tandy ignores the legal distinction between trademark use and trademark registration. AutoZone claims that Tandy has not provided any evidence that any of these marks is being used in the marketplace. However, Tandy has provided volumes of printouts from web pages as a demonstration of current "use" of the "zone" marks.

AutoZone disputes that it has not been diligent in protecting its marks. AutoZone contends that some of the "zone" marks to which Tandy refers do not infringe or dilute the AUTOZONE mark due either to

the mark itself or the goods or services on which it is used. For others, it states that it has actively policed uses of "zone" marks. Specifically, AutoZone has objected to other marks by taking steps such as opposing registration, sending cease-and-desist letters, commencing cancellation proceedings, and filing civil actions in district courts. For example, AutoZone argues that it successfully challenged use of the marks TIRE ZONE AT FIRE-STONE, LUBEZONE, AUTO SHINE ZONE, and CAR ZONE. Importantly, each of these challenged marks was used in the automotive industry. Finally, Auto-Zone has sent letters to more than fifty owners of conflicting, but inactive, domain names advising that AutoZone would take appropriate action if future use caused a likelihood of confusion.

Interestingly, AutoZone also points out that Tandy's argument in this case is at odds with the position it argued in the earlier Auto Shack litigation. In that case, there was extensive evidence of third-party use of "Shack" marks. Tandy argued that such use had minimal effect on the strength of the RADIO SHACK mark.

Because of the incontestability of the AUTOZONE mark, AutoZone is entitled to the presumption that its mark is strong. While the evidence of the third party use of other "zone" marks is probative of the issue of strength, the Court concludes that the AUTOZONE mark is indeed a strong mark.

### 3. Relatedness of the Goods

 As a general rule, the goods and services at issue in a trademark infringement case are related if they are marketed and consumed in such a manner that consumers are likely to believe that they emanate from the same source, or are somehow connected with or sponsored by a common company. *See Champions Golf*

*Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1118 (6th Cir.1996) (*"Champions"*). The Sixth Circuit has said that cases generally fit into one of three categories regarding the relatedness of the goods and services of the parties. *See Daddy's,* 109 F.3d at 282. First, if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; second, if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; and third, if the goods or services are totally unrelated, confusion is unlikely. *See id.*

The parties dispute the degree to which their goods are related. Tandy asserts that AutoZone and Radio Shack sell different types of products; Radio Shack sells consumer electronic products and Auto-Zone sells automotive products. Tandy contends that there is less than a one percent overlap in the inventories of the two stores.

AutoZone replies by stating that the focus of the case is the "store within a store" concept at Radio Shack and that within the PowerZone section, forty percent of the products are also sold at Auto-Zone.

The Court finds that Tandy's comparison above (using all of the products sold by the stores) is the truer reflection of the degree to which these two retailers compete. There would be very few consumers who would attempt to locate an automotive part at Radio Shack. The converse is also true; very few people would seek a consumer electronic good at AutoZone. Consequently, the relatedness of the goods factor weighs against likelihood of confusion.

### 4. Evidence of Actual Confusion

 Evidence of actual confusion is the best evidence of likelihood of confusion.

See Wynn Oil, 839 F.2d at 1188. However, the absence of actual confusion evidence is not a significant factor in determining that confusion is not likely. See id. Courts may nevertheless infer that an absence of actual confusion evidence means that confusion is unlikely when the circumstances indicate that such evidence should be available. An absence of actual confusion evidence after a significant degree of concurrent sales is one circumstance where a court may infer that confusion is unlikely. See Homeowners Group, 931 F.2d at 1110.

AutoZone has not provided any evidence of actual confusion. While admitting that it lacks such evidence, AutoZone claims that the Rappeport survey supports its claim of actual confusion. Although such survey results could be probative of the level of actual confusion, the survey in this case could not create such evidence. In his deposition, Rose admitted that the survey was directed "to the issue of the strength of the plaintiffs' mark," not to actual confusion. Oddly, during the survey, Rappeport never showed the survey respondents the POWERZONE mark. Therefore, the Rappeport survey gives no indication that customers will mistakenly believe that Tandy's use of the POWER-ZONE mark means that the AutoZone stores are somehow affiliated or connected.

Tandy contends that the absence of evidence of actual confusion, coupled with the large number of customers and annual sales at the parties' stores, supports the conclusion that no confusion is likely to occur.

The Court concludes that there are no genuine issues of material fact with respect to actual confusion. This factor weighs against likelihood of confusion given the lack of evidence of actual confusion despite the three years of concurrent use of the marks.

### 5. Marketing Channels

The marketing channels factor requires the court to consider the similarities or differences between the predominant customers of the parties' goods or services. See Daddy's, 109 F.3d at 285. Further, a court must determine whether the marketing approaches employed by the parties resemble each other. See id.

As AutoZone points out, AutoZone and Tandy each own and operate a large chain of retail stores that cater to the general public. As a result, AutoZone and Radio Shack stores are frequently located in the same city and it is likely that they share at least some of the same customers. Radio Shack and AutoZone also market their products through the same types of media, including television, newspaper, and magazine advertisements.

Tandy counters that different customers shop at Radio Shack stores and AutoZone stores. Tandy claims that AutoZone's customers are persons who need automotive parts, supplies, and services while Radio Shack's customers need consumer electronics parts and services. As a result, they market their goods to people with different needs. This argument does not withstand scrutiny. Tandy admits that the customer base for Radio Shack stores is the general public, the same general public to whom AutoZone is directing its advertising.

Tandy also contends that the marketing channels used are different because of the differing uses of the trademarks in the advertising. Tandy states that the POWERZONE mark is only used in conjunction with the RADIO SHACK house mark. Tandy contends that this usage is different from AutoZone's use of its own AUTO-ZONE trademark, which serves as its primary trademark. No courts have exam-

ined this factor in the level of detail that Tandy suggests. Most of the cases that have analyzed this factor have only looked at it from the very broadest level. For example, courts have determined that marketing channels were different in the following instances: (1) if one party markets to industrial customers and one to retail customers, *see American Cyanamid Co. v. S.C. Johnson & Son, Inc.*, 729 F.Supp. 1018 (D.N.J.1989), or (2) if one prints brochures for distribution at industry conventions while another uses inserts in newspapers, *see Homeowners Group*, 931 F.2d at 1110–11.

There are no genuine issues of material fact related to the marketing channels. Because both companies target the same potential customers and utilize many of the same marketing outlets, the marketing channel factor weighs in favor of likelihood of confusion.

6. Degree of Purchaser Care

■■■ The standard used by the courts in assessing the likelihood of confusion factor for degree of purchaser care is the "typical buyer exercising ordinary caution." *Daddy's*, 109 F.3d at 285. Generally, the factor weighs in the plaintiff's favor if consumers exercise less care because they are purchasing relatively inexpensive products but weighs in the defendant's favor where consumers exercise greater care because they are purchasing more expensive products. *See Homeowners Group*, 931 F.2d at 1111.

For purposes of summary judgment, Tandy does not contend that the relevant universe of customers possesses any special expertise or sophistication. In addition, Tandy does not argue that the goods sold under the respective trademarks are particularly expensive. This factor, therefore, weighs in favor of likelihood of confusion.

7. Tandy's Intent in Selecting the POWERZONE Mark

■■■ If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity. *See Homeowners Group*, 931 F.2d at 1111. Direct evidence of copying is not necessary to prove intent. *See Wynn Oil*, 943 F.2d at 603. Rather, the use of the contested mark with knowledge of the protected mark at issue can support a finding of intentional copying. *See id.*

Several courts have determined that a defendant's adoption of a mark when aware of plaintiff's similar mark is sufficient to lead to an inference of intentional copying. For example, in *Daddy's*, the evidence of defendant's awareness of plaintiff's mark was small indeed; the court relied simply on the size of plaintiff's market presence to permit an inference of defendant's awareness of the mark. *See Daddy's*, 109 F.3d at 287. In addressing the issue of defendant's intent, the court conceded that "[a]dmittedly, the evidence which could support a finding of intentional copying is slight"; however, because the court was reviewing the grant of summary judgment for the defendant, it determined that the record contained sufficient facts to create an issue regarding whether defendant knew of plaintiff's mark and intentionally patterned its mark after plaintiff's mark. *Id.*

■■■ By contrast, other courts have noted that a junior user's mere knowledge or awareness of the senior user's mark is not the same as an intent to confuse to consumers. For example, the Second Circuit determined that "in the absence of evidence that defendant intended to promote confusion, adoption of a trademark with actual knowledge of another's prior registration of a very similar mark may be

consistent with good faith." *W.W.W. Pharmaceutical Co. v. Gillette Co.,* 984 F.2d 567, 575 (2d Cir.1993). *Accord Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384 (2d Cir.1995). Good faith may be inferred, for example, if a defendant selected a mark which reflects the product's characteristics, requested a trademark search, or relied upon the advice of counsel. *See id.*

Tandy does not dispute that it had knowledge of AutoZone's trademark when it adopted its POWERZONE trademark. In fact, it acknowledges that the 1986 settlement agreement indicated that Auto-Zone would be adopting the AUTOZONE mark.

As evidence of Tandy's bad intent in selecting its POWERZONE mark, Auto-Zone contends that Tandy failed to conduct an adequate assessment of whether POWERZONE would infringe another trademark and failed to obtain a level of legal advice commensurate with its investment in a mark to be used in more than 7,000 stores nationwide. In addition, Auto-Zone contends that although the slanted line design is a prominent feature of the POWERZONE mark and is used extensively within the Radio Shack stores, Tandy never searched for possibly conflicting marks using that design element.

Tandy counters that it adopted the POWERZONE mark because it received the most positive feedback in a consumer study conducted by a third party. Furthermore, it asserts that the assessment actions it undertook in adopting the mark were adequate. These actions included a full Thomson and Thomson trademark search, which revealed numerous "zone" marks, including AutoZone's. Tandy contends, however, that its trademark assessment and the advice of counsel led it to believe that the other "zone" marks, including the AUTOZONE mark, posed no conflict with POWERZONE. Tandy contends that its efforts support a finding of good faith adoption of the mark.

In this case, the Court concludes that Tandy's knowledge of the AUTOZONE mark does not lead to the inference of an intent to deceive consumers. Rather, the Court finds that the marks are sufficiently dissimilar that, despite Tandy's awareness of AUTOZONE prior to the adoption of its mark, intent cannot be inferred. The case at bar is distinguishable from *Daddy's* and *Champions,* cases where the Sixth Circuit determined that a defendant's awareness of the plaintiff's mark precluded a finding of lack of intentional copying at summary judgment. In those cases, the marks at issue were much more similar than the marks in this case. For example, in *Daddy's,* the marks each prominently featured the word, "Daddy's." In *Champions,* the parties had selected the same exact name, "Champions Golf Club." As previously discussed, the Court finds that there are significant verbal and visual differences between the marks. If Tandy intended to trade off AutoZone's mark, it undoubtedly would have selected a mark that more closely resembled AUTOZONE. Furthermore, as recognized by the Second Circuit, the assessment efforts undertaken by Tandy are evidence of its good faith adoption. Given the dissimilarity of the marks and Tandy's assessment efforts prior to the adoption of its mark, the Court concludes that an inference of intentional copying is not proper in this case.

**8. Likelihood of Expansion of Product Lines**

■ A "strong possibility" that either party will expand its business to compete with the other or market to the same consumers will weigh in favor of finding that the present use is infringing. *Homeowners,* 931 F.2d at 1112. For the plain-

tiffs to benefit from this factor, they must present evidence that demonstrates a strong possibility that one party will expand to compete with the other.

In this case, AutoZone has presented no evidence suggesting it is expanding to compete in the consumer electronics industry. Furthermore, Tandy has no plans to expand to the automotive parts business. AutoZone claims that the factor weighs on its behalf because it already sells a number of the same products that are sold in the PowerZone section. However, the parties both concede that the factor has little relevance in this instance.

9. Conclusion

As noted above, the Sixth Circuit has explained that in order to preclude a grant of summary judgment, AutoZone must identify a factor or factors "whose resolution would necessarily be dispositive on the likelihood of confusion issue." *Marketing Displays*, 200 F.3d at 934. It is not enough to point to a disputed factor since any one factor alone may not be material. *See id.* In the case at bar, the Court finds that there are no genuine issues of material fact that would preclude a grant of summary judgment on AutoZone's trademark infringement claim. Looking at the eight factors together, the Court determines that the dissimilarity of the marks and the lack of evidence of actual confusion weigh strongly against a finding of likelihood of confusion. Factors that weigh in favor of a likelihood of confusion, including the strength of the AUTOZONE mark and the degree of purchaser care, are less persuasive. In summary, the Court concludes that there are no contested factors "whose resolution would necessarily be dispositive on the likelihood of confusion issue." *See id.* Therefore, the Court will grant summary judgment for Tandy on AutoZone's trademark infringement claim.

**B. Trade Name Infringement**

AutoZone alleges that Tandy adopted and used the confusingly similar mark POWERZONE notwithstanding the prior rights that it had acquired in the mark, AUTOZONE. AutoZone contends that this usage constitutes common law trade name infringement.

 A trade name is a "word, name, symbol, device, or combination thereof used by an enterprise to identify its business and distinguish itself from other similar businesses." *Corporate Catering, Inc. v. Corporate Catering, Etc. LLC*, 2001 WL 266041 (Tenn.Ct.App.2001). The governing issue in a trade name infringement case is whether the purported infringer's use of a particular mark is likely to cause confusion. *See Willowbrook Home Health Care Agency, Inc. v. Willow Brook Retirement Center*, 769 S.W.2d 862, 867 (Tenn.Ct.App.1988). Tennessee courts have analyzed the likelihood of confusion under common law trade name infringement according to the eight factors identified by the Sixth Circuit. *See id.*

As stated above, an analysis using the eight factors for likelihood of confusion leads to the conclusion that use of the mark POWERZONE is not likely to cause confusion with AUTOZONE. Accordingly, the Court shall grant summary judgment for Tandy on AutoZone's trade name infringement claim.

**C. Breach of contract**

AutoZone's breach of contract claim is based on Tandy's use of an allegedly "confusingly similar" mark. Specifically, AutoZone alleges that Tandy's use of POWERZONE constitutes a breach of the settlement agreement from the earlier litigation. Section III.D of the agreement prohibits Tandy from using any trade name or mark which is confusingly similar

to the AUTOZONE name, which was adopted as part of the settlement.

For the reasons stated above, the Court determines that the POWERZONE mark is not confusingly similar to AUTOZONE. Accordingly, use of the mark does not constitute a breach of the settlement agreement and the Court shall grant summary judgment for Tandy on AutoZone's breach of contract claim.

## D. Unfair Competition

■■■ The Lanham Act imposes liability on "[a]ny person who, on or in connection with goods or services ... uses in commerce ... any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin ... of his or her goods, services, or commercial activities." 15 U.S.C. § 1125(a). The deceptive practices prohibited by § 1125 have loosely been described as "unfair competition." *See Johnson v. Jones,* 149 F.3d 494, 502 (6th Cir.1998).

AutoZone argues that Tandy's adoption and use of the POWERZONE mark constitutes a false designation of origin within the meaning of the statute. Specifically, AutoZone alleges that Tandy used the POWERZONE mark "to confuse or deceive the public by misrepresenting the retail store services and products offered for sale ... are in some way connected or affiliated with Plaintiffs."

For the reasons stated in the likelihood of confusion analysis above, the Court determines that Tandy's use of POWERZONE is not "likely to cause confusion, or to cause mistake, or to deceive ... as to the origin" of its products. Accordingly, the Court shall grant summary judgment for Tandy on AutoZone's unfair competition claim.

## E. Dilution

1. Discussion

■■■ The federal antidilution statute provides that "the owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). To prove a claim for dilution under the federal statute, the plaintiff must establish five necessary elements: (1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark. *See Kellogg Co. v. Exxon Corp.,* 209 F.3d 562, 576–77 (6th Cir.2000) ("*Kellogg*") (citing *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 215 (2nd Cir.1999) ("*Nabisco*")).

A search revealed no reported Tennessee cases interpreting the Tennessee dilution statute. The Tennessee and federal dilution statutes are very similar and the Sixth Circuit has analyzed the claims together. *See Kellogg,* 209 F.3d at 577. As a result, the Court will examine both dilution claims utilizing the five factors outlined above.

Tandy admits that AutoZone is a famous mark for purposes of summary judgment; therefore, the first factor is satisfied. Likewise, the third and fourth factors are not contested in this matter.

■■■ The second factor, distinctiveness, refers to the inherent qualities of a mark and is a completely different concept from fame. *See Nabisco,* 191 F.3d at 215–26. Regarding the distinctiveness component,

the Sixth Circuit recently adopted the discussion of the Second Circuit in *Nabisco*. *See V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464, 469 (6th Cir.2001) (*"V Secret"*). Quoting from the *Nabisco* opinion, the Sixth Circuit stated that "[a] mark that, notwithstanding its fame, has no distinctiveness is lacking the very attribute that the antidilution statute seeks to protect." *Id.* "Many famous marks are of the common or quality-claiming or prominence-claiming type—such as American, National, Federal, Federated, First, United, Acme, Merit, or Ace." *Id.* These marks, though famous, do not receive the protection of the dilution statute.

The federal antidilution statute itself offers some guidance with respect to an evaluation of a mark's distinctiveness. The statute instructs that:

> In determining whether a mark is distinctive, a court may consider factors such as, but not limited to: (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. 15 U.S.C. § 1125(c)(1).

In addition to the above statutory analysis of distinctiveness, evaluation of distinctiveness in a traditional trademark infringement claim places a mark on a continuum reflecting its inherent strength or weakness. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir.1976) (outlining the spectrum analysis that has gained broad acceptance). At the low end are generic words. *See Nabisco*, 191 F.3d at 215. "Such words are without distinctiveness and are ineligible for protection as marks because to give them protection would be to deprive competitors of the right to refer to their products by name." *Id.* More distinctive than generic marks are descriptive marks, those that describe the product or the attributes. *See id.* These have little inherent distinctiveness and are ineligible for protection unless they have acquired secondary meaning. *See id.* The next more distinctive marks are suggestive marks. *See id.* These marks do not name the product for which they are used, but suggest the qualities or claims of the product. The most distinctive marks are labeled arbitrary and fanciful. *See id.* A mark is arbitrary or fanciful if there is no logical relationship between the mark and the product for which it is used.

As noted, Tandy asserts that the AUTOZONE mark is not distinctive. Tandy primarily argues that the extensive use of the "zone" portion of its mark precludes a finding of distinctiveness.

Despite the evidence of third party use of "zone" marks, the uncontested evidence leads to a conclusion that AUTOZONE is correctly to be considered a distinctive mark regardless of whether the Court considers the statutory factors or the traditional spectrum approach. Several of the statutory factors lead to the conclusion that AUTOZONE is distinctive. For example, AutoZone began using the AUTOZONE mark in commerce in 1987. It operates approximately 3,000 stores in 42

states and it has advertised extensively using the AUTOZONE mark. Furthermore, AutoZone filed an affidavit under 15 U.S.C. § 1065 that rendered its registration of its mark incontestable, which entitles AutoZone "to a presumption that its registered trademark is inherently distinctive." *Equine Technologies, Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 545 (1st Cir. 1995).

Similarly, analysis using the traditional spectrum approach would lead to the same conclusion. Under such an analysis, the Court finds that, although AUTOZONE is neither arbitrary or fanciful, it has acquired secondary meaning, and therefore distinctiveness, in the retail auto parts market. Such a conclusion is supported by the evidence in the record that the mark has been used in commerce since 1987 and AutoZone has expended millions of dollars in advertising since that time.

The Court finds, as did Second Circuit in *Nabisco*, that the AUTOZONE mark is "neither near the top nor the bottom of the ladder of distinctiveness, but it is reasonably distinctive—certainly sufficiently so to qualify for the statute's protection." *Nabisco*, 191 F.3d at 216.

██ The final factor to be analyzed by the Court is the degree to which the junior use causes dilution of the distinctive quality of the mark. With respect to this factor, the Sixth Circuit's *V Secret* opinion also adopted the analysis of the Second Circuit in *Nabisco*. *See v. Secret*, 259 F.3d at 476. In particular, the court noted that the Second Circuit developed a list of ten nonexclusive factors to determine if dilution has, in fact, occurred. *See id.* These include: distinctiveness; similarity of the marks; proximity of the products and likelihood of bridging the gap; interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products; shared

consumers and geographical limitations; sophistication of the consumers; actual confusion; adjectival or referential quality of the junior use; harm to the junior user and delay by the senior user; and the effect of the senior's prior laxity in protecting the mark. *See id.* After reciting this lengthy list, the Sixth Circuit summarily found that dilution had occurred, "even without an exhaustive consideration of all ten factors." *See id.* at 477. The opinion in *V Secret*, therefore, provides little guidance on the application of the prescribed factors. Consequently, the Court will look to the explication of the factors contained in the *Nabisco* opinion.

a. Distinctiveness of the senior mark

The court in *Nabisco* noted that distinctiveness plays a dual role in the dilution analysis. *See Nabisco*, 191 F.3d at 217. First, as noted above, it is a statutory element; under the statute, a mark does not receive protection unless it is distinctive. Second, the *Nabisco* court determined that the degree of distinctiveness of the senior mark will have a considerable bearing on whether the junior use will have a diluting effect. *See id.* at 217. The more distinctiveness the mark possesses, the greater is the interest to be protected from dilution.

For the reasons stated in the distinctiveness analysis above, the Court concludes that, for the purposes of dilution analysis, the AUTOZONE mark exhibits a moderate degree of distinctiveness, entitling it to a commensurate level of protection.

b. Similarity between the marks

██ The federal anti-dilution statute is silent on the question of how similar the conflicting marks must be to state a valid claim for dilution. Generally, however, the marks must be sufficiently similar so that, in the mind of the consumer, the junior mark will conjure an association with the

senior. *See id.* Courts, including the Sixth Circuit, have determined that a valid claim for dilution requires greater similarity between the marks than for a likelihood of confusion claim. *See Jet,* 165 F.3d 419, 425 (6th Cir.1999). The Court reasoned in *Jet* that "[t]he purpose of anti-dilution laws is to provide a narrow remedy when the similarity between the two marks is great enough that even a noncompeting, nonconfusing use is harmful to the senior user." *Id.* In *Jet,* the Sixth Circuit affirmed summary judgment for the defendant by reasoning that, because JET and AEROB–A–JET were not similar enough to satisfy the likelihood of confusion test, they were not sufficient to support a dilution claim. *Id.*

Professor McCarthy notes that many states require marks in dilution cases to be "virtually identical," and that for dilution to occur, "the marks must at least be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same." McCarthy, § 24:90.2.

In this case, the marks are different in sight, sound, and meaning; they share only the common descriptive suffix "zone." The most prominent portion of each mark is not the shared "zone" portion but the initial syllables. *Accord Jet,* 165 F.3d at 423. The facts in the case are similar to those in *Jet,* where the Sixth Circuit affirmed summary judgment for the defendant on plaintiff's dilution claim. The Court noted that "Jet's theory would permit it to enjoin the use of a vast number of registered trademarks containing the word 'jet' and used in unrelated industries." *Jet,* 165 F.3d at 425–25. The similarity factor, therefore, weighs against a finding of dilution.

c. Proximity of the products and likelihood of "bridging the gap"

The Second Circuit in *Nabisco* concluded that similarity of the products was a relevant factor despite the fact that the legislative history of many antidilution statutes shows that legislatures were primarily concerned with junior uses of famous marks on products unrelated to the senior area of commerce. *See Nabisco,* 191 F.3d at 218. The court determined that dilution could just as easily occur on products that compete. *See id.* The court concluded, "the closer the junior user comes to the senior's area of commerce, the more likely it is that dilution will result from use of a similar mark." *Id.* at 219. Although the marks may not be used to compete with one another at present, the factor also "recognizes the senior's interest in preserving avenues of expansion and entering into related fields." *Id.*

As noted in the discussion of likelihood of confusion, the parties dispute the degree to which they compete. The Court concludes, as it did in the previous context, that the level of competition between Auto-Zone and Radio Shack is low, particularly given the breadth and divergence of the respective product lines. Furthermore, the parties have produced no evidence that they intend to enter each other's area of commerce. This factor, therefore, weighs against dilution.

d. Interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and proximity of the products

The Second Circuit recognized that there is a close interrelationship among the first three factors such that the weaker any of the three factors may be, the stronger the others must be in order to make a case for dilution. *See id.* at 219–20. In this case, there is a moderately distinctive mark combined with marks that are fairly dissimilar used in different areas

of commerce. Despite the relative distinctiveness of AutoZone's mark, the Court finds that there is a low likelihood of dilution.

### e. Shared consumers and geographic limitations

■ This factor requires the court to examine the extent of the overlap among consumers of the senior user's products and the junior user's products. *See id.* As discussed in the context of likelihood of confusion, although the products offered by the two parties differ, the consumers represent the general public. Furthermore, each of the chains has a substantial national presence. As a result, this factor favors likelihood of dilution.

### f. Sophistication of the consumers

As in the likelihood of confusion context, courts have found that consumers who are highly familiar with the particular market segment are less likely to be confused by similar marks; conversely, consumers who are unsophisticated are more vulnerable to confusion. *See id.* Tandy does not assert that the relevant consumer public has any special sophistication; therefore, this factor favors the likelihood of dilution.

### g. Actual confusion

The court in *Nabisco* recognized that "while ... neither actual confusion nor likelihood of confusion is necessary to sustain an action for dilution, it does not follow that actual confusion cannot be highly probative of dilution." *Id.* at 221. When consumers confuse the junior mark with the senior, dilution by blurring has occurred. *See id.*

AutoZone has offered no evidence of actual confusion. Therefore, the factor weighs against likelihood of dilution.

### h. Adjectival or inferential quality of the junior mark

■ "The stronger the adjectival association between the junior use and the junior area of commerce, the less likelihood there is that the junior's use will dilute the strength of the senior mark." *Id.* at 221. "It is a generally accepted principle of trademark law that a senior claim to a mark does not bar a junior from using the same words (or symbols) comprising the mark in their descriptive sense." *Id.* (citing 15 U.S.C. § 1115(b)(4)).

In the current case, there is a strong association between Tandy's POWERZONE mark and the goods offered in that section of its stores. Furthermore, using the principle cited above by the *Nabisco* court, AutoZone's use of the "zone" component of its mark should not prevent other retailers from using the designation in their operations. This factor does not support a finding of likelihood of dilution.

### i. Harm to the junior mark and delay by the senior user

■ This factor requires the court to consider "whether the senior user's effort to enjoin the junior use was made with reasonable promptness and whether the junior user will suffer harm resulting from any such delay." *Id.* at 222. The rationale for the factor is that the junior user may have accumulated substantial goodwill in the time before the suit.

In this case, AutoZone requested that Tandy cease using the POWERZONE designation within seven months of its commencement. AutoZone, therefore, did not permit any substantial delay in its enforcement efforts against Tandy.

### j. Effect of the senior's prior laxity in protecting the mark

■ The court should also consider the senior user's prior laxity, if any, in allow-

ing others to utilize other similar marks. *See id.* Tandy has produced evidence of third party use of "zone" marks and contends that AutoZone has exhibited renewed vigilance in protecting its mark in response to this lawsuit. When the evidence is viewed in the light most favorable to AutoZone, however, the Court determines that AutoZone has not been lax in protecting its mark.

2. Conclusion

The Court concludes that there is no genuine issue of material fact with respect to AutoZone's dilution claim against Tandy. To prove a claim for dilution under the federal statute, the plaintiff must establish five necessary elements: (1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark. Factors one, three, and four are conceded for purposes of summary judgment. The Court determines that the AUTOZONE mark is moderately distinctive, so the second factor is not fatal to AutoZone's claim. However, upon analysis of the factors recited by the Sixth Circuit in the *V Secret* case to determine if a junior use dilutes the distinctive qualities of the senior mark, AutoZone's dilution claim fails as a matter of law. After concluding that the AUTOZONE and POWERZONE marks are not sufficiently similar given the heightened similarity requirement in the dilution context, the other factors weighing in favor of dilution are inadequate to preclude summary judgment on AutoZone's dilution claim.

### IV. Conclusion

For the above stated reasons, Tandy's motion for summary judgment on each of AutoZone's claims shall be GRANTED.

An appropriate order will enter.

### *ORDER*

Plaintiffs AutoZone, Inc. and Speedbar, Inc. ("Plaintiffs") bring this action against defendant Tandy Corp. ("Defendant"). The complaint sets forth five claims: (1) service mark and trademark infringement; (2) trade name infringement; (3) breach of contract; (4) unfair competition; and (5) service mark and trademark dilution. Defendant moves for summary judgment on each of Plaintiffs' claims. For the reasons discussed in the accompanying memorandum, Defendant's motion is GRANTED in its entirety and Plaintiffs' claims are dismissed with prejudice.

It is so ordered.