*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0200P (6th Cir.)
File Name: 04a0200p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

AUTOZONE, INC. and
SPEEDBAR, INC.,
　　　*Plaintiffs-Appellants,*

　　　*v.*

TANDY CORP.,
　　　*Defendant-Appellee.*

No. 01-6571

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 99-00884—Thomas A. Wiseman, Jr., District Judge.

Argued: April 21, 2004

Decided and Filed: June 29, 2004

Before: BATCHELDER and MOORE, Circuit Judges;
CALDWELL, District Judge.*

_____

\* The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of Kentucky, sitting by designation.

———————————

## COUNSEL

**ARGUED:** Alan S. Cooper, SHAW PITTMAN, Washington, D.C., for Appellants. Jane Michaels, HOLLAND & HART, Denver, Colorado, for Appellee. **ON BRIEF:** Alan S. Cooper, SHAW PITTMAN, Washington, D.C., Robb S. Harvey, WALLER, LANSDEN, DORTCH & DAVIS, Nashville, Tennessee, for Appellants. Jane Michaels, HOLLAND & HART, Denver, Colorado, Timothy P. Getzoff, HOLLAND & HART, Boulder, Colorado, Douglas R. Pierce, KING & BALLOW, Nashville, Tennessee, for Appellee.

———————————

## OPINION

———————————

KAREN NELSON MOORE, Circuit Judge. This case springs from a trademark dispute between two large nationwide retailers in the seemingly disparate markets of automotive parts and electronics. Plaintiff-Appellant AutoZone, Inc. ("AutoZone") is a nationwide retailer of consumer automotive products that uses the mark AUTOZONE. AutoZone and its wholly owned subsidiary Speedbar, Inc. brought an action against Defendant-Appellee Tandy Corporation ("Tandy" or "Radio Shack"), which owns the Radio Shack chain, after Tandy began using its POWERZONE mark to promote a section of its retail outlets dedicated to selling various power-related items, such as batteries, extension cords, and chargers for electronics. AutoZone alleged that Tandy's use of POWERZONE constituted trademark infringement, tradename infringement, unfair competition, breach of contract, and trademark dilution. The United States District Court for the Middle District of Tennessee granted Tandy's motion for summary judgment and dismissed all of AutoZone's claims. Because

AutoZone has not presented enough evidence such that a reasonable jury could conclude that there existed a "likelihood of confusion" between POWERZONE and AUTOZONE or that Tandy's use of POWERZONE diluted the AUTOZONE mark, we **AFFIRM** the judgment of the district court.

## I. FACTS AND PROCEDURE

### A. The 1982 Litigation

Although this particular round of legal action was instigated by Tandy's adoption of the POWERZONE mark, AutoZone and Tandy's litigious relationship dates back two decades. In 1979, AutoZone's predecessor Malone & Hyde, Inc. ("M&H") opened a chain of retail-auto parts stores in Tennessee and Arkansas under the name "Auto Shack." Tandy brought a trademark infringement action against M&H for the use of the AUTO SHACK mark. *Tandy Corp. v. Malone & Hyde, Inc.*, 581 F. Supp. 1124, 1126-27 (M.D. Tenn. 1984), *rev'd*, 769 F.2d 362 (6th Cir. 1985). The parties settled in 1987: M&H ceased using AUTO SHACK, Tandy agreed to M&H's use of AUTOZONE, and Tandy was contractually barred from using AUTOZONE or any other name or mark confusing similar to AUTOZONE.

### B. AutoZone, Tandy, and the Disputed Trademarks

#### 1. AutoZone

In the years following the settlement, AutoZone blossomed into a large, successful national chain, which currently owns or franchises more than 3,000 stores in forty-two states and Mexico and which reported $4.5 billion in sales in 2000. AutoZone sells a wide variety of automotive parts and supplies, including car batteries, tires, engine parts, and assorted automotive peripherals. Some products sold at AutoZone are also sold at Radio Shack, including automobile power adapters, car stereos, amplifiers, cables, connectors,

switches, radar detectors, alarms, and citizen's band radio receivers. AutoZone also sells commonly available consumer items, such as batteries, extension cords, power strips, and tools, all of which a consumer could find at Radio Shack, as well as at a variety of convenience stores, supermarkets, and department stores. Depending on the size of the store, an AutoZone outlet carries either 21,500 different products (as measured by stock keeping units, or SKUs) or 55,100 different products. Of the 325 products sold by Radio Shack in its POWERZONE section, 132 products are also carried by AutoZone. Thus, less than 1% of all the products offered by AutoZone overlap with those sold in the POWERZONE section.

The AUTOZONE mark consists of the word "AutoZone" slanted to the right and spelled with a capital "A" and "Z." The mark also features a "speedbar" design, which consists of diagonal bars of decreasing thickness intended to convey an impression of rapidity or movement. When in color, the word "AutoZone" is red, and the speedbar design is orange. When color advertising is not available, the AutoZone mark naturally appears in black and white. Generally, the speedbar design is located either to the left or to the right of the word "AutoZone," but occasionally the speedbar design appears on both sides of the name. There is no dispute that AutoZone properly registered the name and the speedbar design with the Patent and Trademark Office ("PTO").

#### 2. Tandy

Tandy is largest nationwide retailer of consumer electronics. Through its 7,186 Radio Shack outlets, it reported $4.1 billion in sales in 1999. As a marketing tactic, Radio Shack pursued a "store within a store concept": it physically grouped its core target products into separate sections within its retail outlets. For example, within a Radio Shack outlet a consumer might find a Sprint Communications Store, an RCA Digital Entertainment Center, a Microsoft Information Center, and a Compaq Creative learning center.

At some point in the mid-1990s, Radio Shack sought to create a store-within-a-store for one of its primary anchors — "the business of connecting things," which includes batteries, power supplies, cords, connectors, and resistors. Joint Appendix ("J.A.") at 168 (David Edmondson Dep.). Market research conducted by Radio Shack demonstrated that consumers preferred POWERZONE as the name for the new power-related store-within-a-store. Before launching the POWERZONE concept, Radio Shack hired a trademark search firm, which discovered a Georgia business that used the POWERZONE mark and sold various types of batteries. Radio Shack purchased the rights to the POWERZONE mark from this firm and began using the mark on July 2, 1998.

The POWERZONE mark features the word "PowerZone," spelled with a capital "P" and a capital "Z," bookended by graphic elements consisting of same-sized diagonal lines slanting to the right. The word "PowerZone" generally appears on a clearly defined, cylindrical object that closely resembles a battery and is centered in between the slanted lines moving outward from the battery. The words Radio Shack and an "R" with a circle around it, which is a Radio Shack trademark, also appear on the battery. In some advertisements, the battery, containing the word "PowerZone" and the Radio Shack mark, appears without the slanted lines. Additionally, in some advertisements, the word "PowerZone" is depicted without any accompanying graphics. The POWERZONE mark almost always appears in black and white. However, in color advertisements, the word PowerZone is written in white, and the battery has a coppery yellow-orange color.

With limited exceptions, Radio Shack uses POWERZONE either as a complement to or in close physical proximity with the Radio Shack name and the Radio Shack house mark, such that a consumer would be unlikely to see one without the other whether in advertising or at an actual Radio Shack outlet. AutoZone uncovered at least one example in which POWERZONE appeared without the accompanying Radio

Shack mark on Radio Shack's website. In this example, the words "Radio Shack" and "RadioShack.com" appear multiple times in close proximity to the word POWERZONE, and a consumer would not see the word POWERZONE without either purposely going to or being directed to RadioShack.com.

## C. Procedural Background

Shortly after Radio Shack began using the POWERZONE mark, AutoZone requested that Radio Shack stop and retract its application to register the mark. AutoZone sent Radio Shack a formal cease-and-desist letter on February 1, 1999. Radio Shack refused to comply. AutoZone filed this action in the United States District Court for the Middle District of Tennessee on September 15, 1999. It asserted five claims for relief: 1) service mark and trademark infringement, *see* 15 U.S.C. § 1114(1); 2) tradename infringement, *see id.*; 3) unfair competition, *see* 15 U.S.C. § 1125(a); 4) service mark and trademark dilution under both federal and Tennessee statutes, *see* 15 U.S.C. § 1125(c) and Tenn. Code Ann. § 47-25-513; and 5) breach of contract. The district court properly asserted jurisdiction over claims one through four pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331, 1338(a) (trademark claim), 1338(b) (unfair competition). The court also properly exercised jurisdiction over AutoZone's breach of contract claim and Tennessee state dilution claim pursuant to 28 U.S.C. §§ 1332(a)(1), 1367(a).[1] As part of the discovery that took place through 2000 and 2001, AutoZone commissioned a consumer survey from its expert, Michael Rappeport ("Rappeport"). The purpose of the survey, the

---

[1] AutoZone is a Nevada corporation, which has its principal place of business in Memphis, Tennessee. Speedbar, Inc. ("Speedbar"), which is wholly owned by AutoZone, is also captioned as a named plaintiff-appellant. Speedbar is a Nevada corporation, which has its principal place of business in the Cayman Islands. Speedbar actually owns the AUTOZONE mark and licenses its use to AutoZone. Tandy is a Delaware corporation, which has its principal place of business in Texas.

methodological validity and significance of which are highly disputed, was to demonstrate the strength of the AUTOZONE mark, although AutoZone also believes that the study demonstrates actual confusion between AUTOZONE and POWERZONE. Additionally, for the purposes of demonstrating that third-party use of trademarks containing ZONE was pervasive, Radio Shack discovered that as of March 16, 2001, there were 745 active trademarks that used or incorporated ZONE. At least sixteen of the registered marks were used in the automotive or travel-related industries. At least forty-three entities operated websites that use ZONE either alone or in conjunction with other words.

Radio Shack filed a motion for summary judgment on March 19, 2001, which the district court granted in its entirety on November 9, 2001. The district court held that there were no genuine issues of material fact regarding the likelihood of confusion between the AUTOZONE and POWERZONE marks. *AutoZone, Inc. v. Tandy Corp.*, 174 F. Supp. 2d 718, 726-33 (M.D. Tenn. 2001). The district court also ruled that summary judgment was proper as to AutoZone's dilution claim. *Id.* at 734-39. AutoZone timely appealed, and we have jurisdiction pursuant to 15 U.S.C. § 1121(a) and 28 U.S.C. § 1291.

## II. ANALYSIS

Although AutoZone asserted five separate claims against Radio Shack, the claims can be grouped into two umbrella claims: the "likelihood of confusion" claims and the dilution claim. The trademark infringement, tradename infringement, unfair competition, and breach of contract claims all require us to employ a "likelihood of confusion" analysis. The essence of a trademark or tradename infringement claim brought pursuant to 15 U.S.C. § 1114(1) is "whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir.

1997); *see also* 15 U.S.C. § 1114(1)(a) ("Any person who shall, without the consent of the registrant . . . use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant. . . ."). The unfair competition claim entails the same analysis. Section 43(a) of the Lanham Act imposes liability on:

> Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which — (A) is *likely to cause confusion*, or to cause mistake, or to deceive . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A) (emphasis added); *see Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 604 (6th Cir 1991) ("*Wynn II*") (applying "likelihood of confusion" test to an unfair competition claim brought pursuant to § 1125). Additionally, AutoZone premises its breach of contract claim on Radio Shack's violation of Section III.D of the 1987 Settlement, which prohibited Radio Shack from using "any name or mark . . . which is likely to cause confusion." J.A. at 35 (1987 Settlement, § III.D). Our analysis of the dilution claim is separate and distinct.

## A. Standard of Review

We review de novo the district court's grant of summary judgment in a trademark infringement case. *See Daddy's*, 109 F.3d at 280. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The panel "may affirm the grant of summary judgment to defendant only if the record, when viewed in the light most favorable to the plaintiff, contains no genuine issue[s] of material fact." *Daddy's*, 109 F.3d at 280. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). With the benefit of having all evidence and justifiable inferences drawn from such evidence in its favor, the nonmoving party "must set forth specific facts showing that there is a genuine issue," *id.* at 250 (quoting Fed. R. Civ. P. 56(e)), such that a jury could reasonably find for the nonmoving party.

## B. The "Likelihood of Confusion" Claims

The district court did not err in granting summary judgment on the trademark infringement, tradename infringement, unfair competition, and breach of contract claims because AutoZone failed to show that there existed a genuine issue of material fact concerning the likelihood of confusion. When evaluating the likelihood of confusion, we analyze and balance the following factors:

1. strength of the senior mark (AutoZone)
2. similarity of the marks
3. relatedness of the goods or services
4. evidence of actual confusion
5. marketing channels used
6. likely degree of purchaser care
7. the intent of Radio Shack in selecting the POWERZONE mark
8. the likelihood of expansion of the product lines.

*Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982); *see also Kellogg Co. v.*

*Exxon Corp.*, 209 F.3d 562, 568 (6th Cir. 2000) (applying the *Frisch* factors); *Daddy's*, 109 F.3d at 280 (same). "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. . . . *The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.*" *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991) (emphasis added). A focus on the "ultimate question" is critical when we review a district court's grant of summary judgment; a genuine dispute of material fact on any one of the eight factors does not demonstrate that a grant of summary judgment was improper when there is not enough total evidence for a jury to conclude that the junior mark is likely to confuse consumers. *See id.* ("To resist summary judgment in a case where the likelihood of confusion is the dispositive issue, a nonmoving party must establish, through pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, that there are genuine factual disputes concerning those of the [] factors which may be material in the context of the specific case.").

Neither party disputes three of the eight *Frisch* factors — marketing channels used, likely degree of purchaser care, and likelihood of product-line expansion. First, the "marketing channels used" factor looks at "the parties' predominant customers and their marketing approaches." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 636 (6th Cir. 2002). "Where the parties have different customers and market their goods or services in different ways, the likelihood of confusion decreases." *Id.* As national retail outlets, both AutoZone and Radio Shack cater to the same general public and use the same marketing channels. Second, in analyzing the likely degree of purchaser care, "the standard used by the courts is the typical buyer exercising ordinary caution." *Daddy's*, 109 F.3d at 285 (quotation omitted). Customers are

unlikely to use any more than ordinary caution when purchasing the items offered by Radio Shack and AutoZone. Both of the above factors weigh in favor of the likelihood of confusion. Third, "a strong possibility that either party will expand [its] business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners*, 931 F.2d at 1112 (quotation and citation omitted). Neither party intends to expand its business into the other's sphere. This factor accordingly weighs against the likelihood of confusion.

## 1. Strength of Senior Mark

The district court had resolved this factor in AutoZone's favor, concluding that as a matter of law, the AUTOZONE mark was strong. "The strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due. A mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both." *Daddy's*, 109 F.3d at 280 (internal quotations and citations omitted). In general, "[t]he stronger the mark, all else equal, the greater the likelihood of confusion." *Homeowners*, 931 F.2d at 1107. "Trademarks are generally categorized as fanciful, arbitrary, suggestive or descriptive." *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987). "Fanciful and arbitrary marks are considered to be the 'strongest' or most distinctive marks. . . . 'Suggestive' and 'descriptive' marks either evoke some quality of the product (*e.g.*, Easy Off, Skinvisible) or describe it directly (*e.g.*, Super Glue). Such marks are considered 'weaker,' and confusion is said to be less likely where weak marks are involved." *Id.*; *see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1116-17 (6th Cir. 1996) ("A term for which trademark protection is claimed will fit somewhere in [a] spectrum which ranges through (1) generic or common

descriptive and (2) merely descriptive to (3) suggestive and (4) arbitrary or fanciful." (quotations and citations omitted)). AUTOZONE is either a suggestive or a descriptive mark because it either suggests some quality of the AutoZone chain ("Fulfill all your automotive needs here!") or describes the AutoZone stores ("Enter a Zone filled with all things auto!"). The mark is weaker than a fanciful mark (Exxon) or an arbitrary mark (Starbucks), particularly because it uses a word — ZONE — that is commonly found in other trademarks. *See Daddy's*, 109 F.3d at 281 ("[T]he more common a word or phrase is, the less inherent trademark strength it may have, even when the mark has an arbitrary relation to the good or service to which it applies."); *see also Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 260 (5th Cir. 1980) (noting that although application of DOMINO to sugar is arbitrary, the mark faces limited protection outside the food-products industry because DOMINO is relatively common word).

Even though AUTOZONE is a suggestive or descriptive mark, and thus is less likely to cause confusion, there is no dispute that AUTOZONE is incontestable. "Incontestable" trademarks — those that have not been successfully challenged within five years of registration, *see* 15 U.S.C. § 1065 — are presumed to be strong marks. When a mark is incontestable, "an infringement action may not be defended on the ground that the mark is merely descriptive." *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 422 (6th Cir. 1999) (quotation omitted). While *Jet* prevents Radio Shack from arguing that AUTOZONE is weak simply by virtue of its descriptive or suggestive nature, Radio Shack can rebut the presumption of AUTOZONE's strength by proving extensive third-party *use* of similar marks. *Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 625 (6th Cir. 1998) ("[A] mark is weakened outside of the context in which it is used if there is third-party use of the mark.").

Radio Shack contends that extensive third-party use of ZONE-related marks saps the strength of the AUTOZONE

mark. Radio Shack presented evidence that 745 trademarks registered with the U.S. Patent and Trademark Office ("PTO") use the term ZONE in various combinations. Sixteen registered marks use ZONE in the automotive-goods-and-services industry. Furthermore, in excess of forty websites use ZONE for a variety of services. "[M]erely showing the existence of marks in the records of the [PTO] will not materially affect the distinctiveness of another's mark which is actively used in commerce." *Homeowners*, 931 F.2d at 1108. Rather, "to be accorded weight a defendant must show what actually happens in the marketplace." *Id.* at 1108. Radio Shack has succeeded in showing widespread use of ZONE by presenting nearly 200 pages of evidence highlighting the active use of ZONE in a variety of industries.

While ZONE may be used pervasively in the marketplace, Radio Shack has not demonstrated that AUTOZONE is so similarly employed. "[T]he validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993). The unit of analysis in considering the strength of the mark is the entire mark, not just a portion of the mark. There is scant evidence that AUTOZONE is a commonly used mark. Indeed, AutoZone has spent hundreds of millions of dollars in advertising its mark, and there is widespread consumer recognition of AutoZone's use of the mark, as even Radio Shack concedes. Thus, Radio Shack has failed to overcome the presumption that incontestable marks are strong. The district court properly concluded that AutoZone's mark was strong.

AutoZone asserts that the district court erred by not giving enough weight to the strength-of-mark factor in the overall eight-factor test. AutoZone suggests that the court "did not accord AUTOZONE the broad protection to which strong marks are entitled," AutoZone Br. at 38, because the court failed to evaluate the other factors in light of the ruling that AUTOZONE was a strong mark. AutoZone's contention is

baseless; AutoZone has not pointed to any case in which we have stated that the strength-of-mark factor predominates over the other seven *Frisch* factors. Contrary to AutoZone's position, the fact that a mark is strong does not impact our analysis of the similarity of the marks, the relatedness of the products and services, or any of the other factors in the likelihood-of-confusion test.

### 2. Similarity of the Marks

The similarity of the senior and junior marks is "a factor of considerable weight." *Daddy's*, 109 F.3d at 283. "When analyzing similarity, courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* A side-by-side comparison of the litigated marks is not appropriate, although naturally the commonalities of the respective marks must be the point of emphasis. Instead, "courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Id.* (quotations omitted).

Radio Shack distorts this analysis slightly: it requests that we delete ZONE because of the word's common usage and consider only the similarity between AUTO and POWER, of which there is none. By doing so, Radio Shack asks us to violate the "anti-dissection rule," whereby we "view marks in their entirety and focus on their overall impressions, not individual features." *Id.*; *see also Therma-Scan*, 295 F.3d at 633; 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:41, at 23-123 (2003) (hereinafter "McCarthy") ("Conflicting composite marks are to be compared by looking at them as a whole, rather than breaking the marks up into their component parts for comparison. . . . The rationale for the rule is that the commercial impression of

a composite trademark on an ordinary prospective buyer is created by the mark as a whole, not by its component parts.").

The AUTOZONE and POWERZONE marks have some visual and linguistic similarities, but ultimately their differences outnumber their similarities such that the likelihood of confusion is small. For both, the mark appears as a single word, with the first letter and the "Z" in ZONE capitalized. They each have three syllables, although the pronunciation of the first two syllables is not similar. Additionally, both marks are generally featured with a series of slanting lines bookending the main word. That is where the similarities end. Aside from the clear differences in the accentuation of the first syllables, the AUTOZONE font (soft-edged or rounded) is distinct from the POWERZONE font (more angular). The word AUTOZONE is slanted whereas POWERZONE is not. When viewed in conjunction with the slanted lines of decreasing thickness that emanate from the word AUTOZONE, the entire design gives an impression of momentum or speed. By contrast, the slanted lines on either side of the word POWERZONE are all of the same size, perhaps symbolizing the flow of power. Occasionally, POWERZONE appears without the slanted lines. POWERZONE is almost always featured on a cylindrical object that closely resembles a battery, particularly given the clear depiction of a battery's positive node on the right side of the object. AUTOZONE has no such aspect in its design. For the AUTOZONE mark, the word AUTOZONE appears in red and the slanted lines of decreasing width appear in orange. POWERZONE generally appears in black and white, but when it is in a color advertisement, POWERZONE is written in white, the slanted lines are black, and the battery is a coppery-yellow color.

Several cases provide points of comparison. In *Jet* we ruled that the marks JET and AEROB-A-JET were dissimilar. We noted that the two marks differed visually and verbally, partially because the first syllables of the marks received distinct emphasis. *Jet*, 165 F.3d at 423-24 ("The most

prominent part of AEROB-A-JET is not the shared term JET but the initial syllables AEROB-A . . . ."). In *Daddy's*, we ruled that "Daddy's Junky Music Store" and "Big Daddy's Family Music Center" were similar because both firms often advertised using only the nickname "Daddy's" and because "Daddy's" was not just a component of the mark, but was in fact the mark itself. *Daddy's*, 109 F.3d at 283-84. This case is more similar to *Jet* than to *Daddy's*: if both AutoZone and Radio Shack often used the nickname "Zone" or "the Zone," *Daddy's* might control, but instead the differences between the first syllables of POWERZONE and AUTOZONE cannot be ignored, particularly giving the ubiquity of ZONE. *See also Little Caesar*, 834 F.2d at 571-72 (LITTLE CAESARS and PIZZA CAESAR are dissimilar because "Caesar" is often used in selling Italian food and because of the differences in sound and appearance); *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739 (2d Cir. 1998) (finding a dissimilarity between STREETWISE and STREETSMART when both were used to sell maps), *Gruner & Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1079-80 (2d Cir. 1993) (PARENTS magazine and PARENT'S DIGEST magazine not confusingly similar).

Furthermore, the POWERZONE mark's consistent proximity to Radio Shack's house mark is significant. The use of a challenged junior mark together with a house mark or house tradename can distinguish the challenged junior mark from the senior mark and make confusion less likely. 3 McCarthy § 23:43, at 23-129; *see Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) ("[Defendant]'s prominent use of its well-known house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products."); *Luigino's, Inc. v. Stouffer Corp.*, 170 F. 3d 827, 831 (8th Cir. 1999) ("[T]he prominent display of the house marks convey[s] perceptible distinctions between the products."). The co-appearance of a junior mark and a house mark is not dispositive of dissimilarity, but it is persuasive. *See* 3 McCarthy § 23:43, at 23-130.

POWERZONE almost never appears without its accompanying Radio Shack house mark. The Radio Shack mark appears on the battery slightly above the POWERZONE mark. The only deviation from this pattern is a webpage for RadioShack.com. However, multiple references to RadioShack.com and Radio Shack accompany this slightly different use of the POWERZONE mark, such that it would nearly impossible for an internet user to see POWERZONE without simultaneously recognizing its connection to Radio Shack.

In conclusion, the marks are not similar enough to create a likelihood of confusion. There are considerable visual and linguistic differences. Furthermore, the use of the Radio Shack house mark in proximity to POWERZONE reduces the likelihood of confusion from any similarity that does exist.

### 3. Relatedness of Goods or Services

The parties vigorously dispute the relatedness of their goods and services. We have employed three criteria for testing the relatedness factor:

First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely.

*Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003). "The relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Therma-Scan*, 295 F.3d at 633 (quotation omitted). In a variety of other cases, we have held that bulk car wash products and car wash franchises, *see Wynn II*, 943

F.2d at 600, two slightly different types of oxygenating septic filters, *see Jet*, 165 F.3d at 422, and sit-down and carry-out pizza establishments, *see Little Caesar*, 834 F.2d at 571, are related enough to create a likelihood of confusion. However, infrared thermal-imaging devices and ear thermometers, *see Therma-Scan*, 295 F.3d at 623, and real-estate brokers and marketing services for real-estate brokers, *see Homeowners*, 931 F.2d at 1108-09, are not related enough to cause a likelihood of confusion. In *Toucan Golf*, Kellogg claimed that a golf-equipment manufacturer infringed the famous "Toucan Sam" trademark when the golf firm used a mark that featured a toucan "perched upon a golf iron" alongside the word "Toucan Gold." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d at 621-22. Kellogg asserted that even though it primarily manufactured breakfast cereal, its products were related to the golf industry because it offered golf balls and golf shirts featuring the visage of Toucan Sam and because it had run advertisements featuring Toucan Sam on a golf course. *Id.* at 624. We ruled that Kellogg's connection with the golf industry was tenuous, and consequently confusion was unlikely: "We find that no consumer would associate Kellogg with top-line golf equipment based on Kellogg's extremely limited licensing of its characters of novelty items." *Id.* at 625.

AutoZone and Radio Shack do not fit neatly into our tripartite system. On the one hand, common sense suggests AutoZone and Radio Shack do not directly compete: few consumers would make the mistake of traveling to Radio Shack to purchase an oil filter or would enter an AutoZone to buy a DVD player. *See* J.A. at 950 (Sum. J. Hr'g Tr.) (the district court brusquely, but aptly asking, "What idiot who wants to buy an automobile part is going to go to a Radio Shack?"). On the other hand, the products offered by AutoZone and Radio Shack are not completely unrelated. AutoZone and Radio Shack compete directly in selling certain products, even though these products comprise less than 1% of AutoZone's total stock and AutoZone does not extensively advertise the types of products also sold in Radio Shack's

POWERZONE area.  Unlike *Kellogg*, in which the cereal manufacturer had made only superficial and extremely limited in-roads to the golf industry, AutoZone and Radio Shack, which generally occupy distinct niches, converge in the area of power sources and power connections.  We are presented with a competitive context that combines elements of the first and third criteria:  the parties compete directly in a very limited fashion, but for the most part, the products offered by each company are unrelated and their marks are not very similar.

AutoZone believes the degree of relatedness presents a genuine issue of material fact.  AutoZone contends that the district court erred in focusing on the fact that the *total* overlap between the stores (number of products in common/total number of AutoZone products) was less than one percent when AutoZone offers 40% of the products sold by Radio Shack in its POWERZONE area.  There is no factual dispute, however, because both figures are accurate and undisputed.  The pertinent question is which method of examining the overlap best describes the relatedness of the products *as a matter of law*.  The reality is that both figures inform the analysis by demonstrating that there is generally no overlap, except when considering a limited subset of products.  It is also significant that most of these overlapping products are not unique to either Radio Shack or AutoZone, as batteries and power cords are generally offered by many different kinds of retailers, including grocery stores, pharmacies, and hardware stores.  Furthermore, the 40% figure preferred by AutoZone is deceptive.  We have no information about the percentage of Radio Shack products sold in the POWERZONE area.  We also note that the existence of a high percentage of overlap when considering an extremely small subset of products does not demonstrate a high degree of relatedness:  by AutoZone's logic, if POWERZONE stocked only five types of batteries all of which were also sold by AutoZone, the overlap would be 100%, even though in reality Radio Shack and AutoZone

would share only five products of the approximately 55,000 offered by AutoZone.

In sum, although there is a minuscule overlap between the products offered by AutoZone and Radio Shack, which appears larger when limiting the analysis to only the POWERZONE store-within-a-store, the products offered by the two companies are not related enough such that this factor tilts in AutoZone's direction.

### 4.  Evidence of Actual Confusion

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion."  *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 (6th Cir. 1988) ("*Wynn I*").  "[A] lack of such evidence is rarely significant, and the factor of actual confusion is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available."  *Daddy's*, 109 F.3d at 284 (quotation omitted).  AutoZone has failed to present any evidence of actual confusion.  AutoZone and Radio Shack have simultaneously used their marks for three years, but AutoZone has been unable to demonstrate even one instance of actual confusion.  AutoZone's reliance upon the study conducted by Michael Rappeport is misguided.  Even on the undeserved assumption that Rappeport's study is methodologically sound,[2] the study

---

[2] There are several problems with Rappeport's study.  The study attempted to show the strength of the AutoZone mark by giving survey participants in various malls one part of a well-known retail chain (WAL ____ or ____ DEPOT) and asking them to fill in the blank.  One of the questions was "AUTO ____."  Of 110 respondents, 48% answered ZONE, 14% answered PARTS, 25% offered various other answers, and 12% did not offer any response.  First, it is questionable whether the results are statistically significant given the small number of respondents.  Second, the surveyors told participants at the outset that the survey sought to test their knowledge of retail chains.  This preliminary statement limited the universe of potential answers to the fill-in-the-blanks questions.

Rappeport has been criticized by other courts for the employment of

neither provides evidence of actual confusion nor creates a genuine issue of material fact on the matter. The study ostensibly sought to discern the strength of AutoZone's mark. J.A. at 101 (Rappeport Study) (labeling the study as an attempt "to test the strength and perception of the mark AUTOZONE."). No aspect of the study actually tested whether randomly chosen survey participants were confused between the two marks. In fact, the study did not even mention POWERZONE or Radio Shack. Because AutoZone presented no evidence of actual confusion, this factor should not have any bearing on the analysis.

### 5. Radio Shack's Intent

Finally, AutoZone argues that the district court erred because there is a genuine dispute over whether Radio Shack intentionally infringed upon the AUTOZONE mark. Proving intent is not necessary to demonstrate likelihood of confusion, but "the presence of that factor strengthens the likelihood of confusion." *Wynn II*, 943 F.2d at 602; *see also Wynn I*, 839 F.2d at 1189 ("While . . . we do consider intention to be relevant when a plaintiff shows that a defendant knowingly copied the contested trademark, . . . absent such a showing, intentions are irrelevant."). "If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *Homeowners*, 931 F.2d at 1111. "Circumstantial evidence of copying, particularly the use of a contested mark with

---

faulty methodologies and the presentation of unreliable results. *See Indianapolis Colts, Inc. v. Metro. Baltimore Football Club, Ltd. P'Ship*, 34 F.3d 410, 415 (7th Cir. 1994) ("The defendants' [study] was . . . summarized in a perfunctory affidavit by Dr. Rappeport to which the district judge gave little weight. That was a kindness. The heart of Rappeport's study was a survey that consisted of three loaded questions asked in one Baltimore mall. Rappeport has been criticized before for his methodology, and we hope that he will take these criticisms to heart in his next courtroom appearance.") (citing *Jaret Int'l, Inc. v. Promotion in Motion, Inc.*, 826 F. Supp. 69, 73-74 (E.D.N.Y. 1993)).

knowledge of the protected mark at issue, is sufficient to support an inference of intentional infringement where direct evidence is not available." *Therma-Scan*, 295 F.3d at 638-39. The intention factor naturally is considered in light of the other factors; a bad-faith intent to infringe upon another mark may not increase the likelihood of confusion if the other seven factors suggest that confusion is improbable.

AutoZone has presented no direct evidence of an intent by Radio Shack to infringe upon the AUTOZONE mark. AutoZone does not dispute Radio Shack's assertion that it "did not copy the AUTOZONE mark or intend to trade off any of [AutoZone]'s goodwill in AUTOZONE when it chose the POWERZONE mark." J.A. at 784 (Pl. Local Rule 8(b)(7) Statement). Indeed, there is simply no evidence that Radio Shack chose the POWERZONE mark in order to steal customers from AutoZone. Radio Shack apparently selected POWERZONE based solely upon the results of a consumer survey.

AutoZone instead argues that circumstantial evidence of copying supports an inference of intentional infringement. As proof that Radio Shack was carelessly or negligently indifferent to AutoZone's trademark rights, AutoZone points to Radio Shack's knowledge of the AUTOZONE mark in conjunction with Radio Shack's failure to consult an attorney knowledgeable in trademark law before adopting POWERZONE. Radio Shack concedes that as a corporation it was aware of the AUTOZONE mark when it chose the POWERZONE mark, which is unsurprising given that Radio Shack itself agreed to the use of AUTOZONE as part of the 1987 Settlement. This circuit has not yet decided whether evidence of carelessness or negligence with regards to searches for preexisting marks suffices as circumstantial proof of an intent to infringe. We do not decide this issue today, although our decision in *Daddy's* implies the potential difficulty of employing such a standard. *See Daddy's*, 109 F.3d at 286-87 ("Plaintiff is incorrect to the extent that it is suggesting that the mere prior existence of a registered mark

demonstrates that the alleged infringer intentionally copied that mark; otherwise, presumably all trademark infringement cases could result in a finding of intentional copying."); *see also A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 226, 232-33 (3d Cir. 2000) (stating that "mere carelessness" is not enough to prove intent). Even if we were to assume that carelessness or negligence is sufficient to create an inference of an intent to infringe, there is no evidence that Radio Shack was careless or negligent in choosing POWERZONE. Radio Shack conducted two separate trademark searches — one through a trademark search company (Thompson & Thompson) and another through in-house counsel. Radio Shack chose POWERZONE, even though it knew about the AUTOZONE mark, because it believed that there was no infringement given the dissimilarity of the marks and the unrelatedness of the products offered by each company.

AutoZone has not presented any evidence of bad intent. Nor has it presented any circumstantial evidence of negligence or carelessness, if such evidence suffices to create an inference of intent to pilfer the goodwill in the AUTOZONE mark. This factor weighs against the likelihood of confusion.

### 6.  Conclusion

The district court did not err in granting Radio Shack's motion for summary judgment because AutoZone did not present enough evidence for a jury to conclude that there was a likelihood of confusion. Most of the factors weigh against the likelihood of confusion: there is no evidence of actual confusion, the marks are not similar, there is no evidence that Radio Shack intended to cause confusion over the marks, and neither party plans to expand its product lines into the other's at any point in the near future. The relatedness-of-products factor at best does not aid the analysis and at worst suggests that the likelihood of confusion is small, given that AutoZone and Radio Shack offer completely disparate products except

for one relatively small portion of their respectively enormous inventories. It is true that AutoZone's mark is strong, that AutoZone and Radio Shack use common marketing channels, and there is a low degree of purchaser care, all of which weigh in favor of a likelihood of confusion. Yet, these factors are not enough to tip the balance. In considering the touchstone question of "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way," *Homeowners*, 931 F.2d at 1107, AutoZone has simply not presented sufficient evidence that consumers are likely to be confused by Radio Shack's use of POWERZONE.

### C.  The Dilution Claim

AutoZone also contests the district court's grant of summary judgment on its dilution claim. AutoZone principally argues that the district court erred as a matter of law because it employed the wrong test in assessing AutoZone's dilution claim. While we decline to rule definitively on the propriety of the test used by the district court, we affirm the district court's grant of summary judgment as proper because AutoZone failed to present any evidence of actual dilution.

### 1.  Dilution As Distinct From Infringement

The law governing dilution is independent from the law attendant to claims of trademark infringement. *Kellogg Co. v. Exxon Corp.*, 209 F.3d at 576. "Dilution law, unlike traditional trademark infringement law . . . is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d at 628. "Courts recognize two principal forms of dilution: tarnishing and blurring. . . . Dilution by blurring, the injury at issue here, occurs when consumers see the plaintiff's mark used on a plethora of different goods and services . . . raising the possibility that the mark will lose its

ability to serve as a unique identifier of the plaintiff's product." *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 466 (7th Cir. 2000) (quotations and citation omitted) (second alteration in original).

The Federal Trademark Dilution Act of 1995 ("FTDA"), Pub. L. No. 104-98, 109 Stat. 985 (1995), "seeks to prevent both of these forms of dilution by protecting the trademark owner from the erosion of the distinctiveness and prestige of a trademark caused by . . . a proliferation of borrowings, that while not degrading the original seller's mark, are so numerous as to deprive the mark of its distinctiveness and hence impact." *Id.* (quotations omitted) (alteration in original). Section 43(c) of the amended Lanham Act provides,

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1). Dilution is defined by the FTDA as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of [] (1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127. The Tennessee state dilution statute is similar to the federal dilution statute. It reads,

> The owner of a mark which is famous in this state shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use of a mark or trade name, if such use begins after the mark has

become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this section.

Tenn. Code Ann. 47-25-513(a). There are no Tennessee cases that analyze this statute, and in the past we have interchangeably analyzed the Tennessee and federal antidilution statutes. *Kellogg Co. v. Exxon Corp.*, 209 F.3d at 577.

### 2. The Federal Dilution Test

We have repeatedly employed a five-part dilution test. To succeed in a federal dilution claim:

> [T]he senior mark must be (1) famous; and (2) distinctive. Use of the junior mark must (3) be in commerce; (4) have begun subsequent to the senior mark becoming famous; and (5) cause dilution of the distinctive quality of the senior mark.

*Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d at 616; *see also Kellogg Co. v. Exxon Corp.*, 209 F.3d at 577; *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 215 (2d Cir. 1999) (creating the test adopted by the Sixth Circuit); 4 McCarthy § 24:89, at 24-146 (outlining a similar test for a prima facie case of trademark dilution). Neither party disputes the application of the first, third, and fourth factors: AUTOZONE is famous, Radio Shack uses the junior mark POWERZONE in commerce, and Radio Shack commenced its use of POWERZONE after AUTOZONE attained widespread recognition.

#### a. Distinctiveness

In the court below, Radio Shack disputed the distinctiveness of the AUTOZONE mark, but the district court held that the mark was distinctive. *AutoZone,* 174 F. Supp. 2d at 736. Radio Shack has not appealed this ruling,

and an evaluation of the eight statutory factors of distinctiveness, *see* 15 U.S.C. § 1125(c)(1)(A)-(H), demonstrates that the district court reached the correct conclusion. The extent of AutoZone's use of the mark, the pervasive and geographically widespread advertising of the mark, the high recognition of the mark, and AutoZone's registration of its mark, which entitles AutoZone to a presumption of distinctiveness, all highlight the distinctive nature of the AUTOZONE mark. However, a finding that the mark was distinctive does not address the degree of distinctiveness, which is part of the test for determining whether the use of a junior mark causes dilution.

### b.  The Fifth Factor

The central dilution issue in this appeal is how to analyze the fifth and final factor, which measures whether the junior mark caused actual dilution of the distinctive quality of the senior mark. The district court, acting properly at the time, relied on our opinion in *V Secret Catalogue, Inc. v. Moseley*, 259 F.3d 464 (6th Cir. 2001) ("*V Secret*"), *rev'd*, 537 U.S. 418 (2003). In *V Secret*, we applied a ten-factor, nonexclusive test to determine whether dilution had occurred. *Id.* at 476; *see Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d at 217-22. The ten factors are:

distinctiveness; similarity of the marks; proximity of the products and the likelihood of bridging the gap; interrelationship among the distinctiveness of the senior mark, the similarity of the junior mark, and the proximity of the products; shared consumers and geographic limitations; sophistication of consumers; actual confusion; adjectival or referential quality of the junior use; harm to the junior user and delay by the senior user; and the effect of [the] senior's prior laxity in protecting the mark.

*V Secret*, 259 F.3d at 476 (quotations omitted) (alteration in original); *see also PACCAR, Inc. v. TeleScan Techs., L.L.C.*,

319 F.3d 243, 257-58 (6th Cir. 2003) (referencing the ten-factor test, but declining to employ it because the issuance of an injunction was proper for other reasons). The district court proceeded through the analysis and held that "[a]fter concluding that the AUTOZONE and POWERZONE marks are not sufficiently similar given the heightened similarity requirement in the dilution context, the other factors weighing in favor of dilution are inadequate to preclude summary judgment on AutoZone's dilution claim." *AutoZone*, 174 F. Supp. 2d at 739.

On appeal, AutoZone asks us to reject the district court's holding and its application of the *Nabisco* test. AutoZone criticizes the *Nabisco* test for erroneously duplicating several factors of the likelihood-of-confusion test and for incorrectly shifting the burden of proving several affirmative defenses onto the plaintiff. In assessing AutoZone's arguments, we must initially determine whether *V Secret* incorporated the *Nabisco* test into the law of this circuit such that we are bound by the decision of a prior panel. It is only if *V Secret* adopted the *Nabisco* test that we must assess what effect the Supreme Court's reversal of *V Secret* has upon our application of the ten *Nabisco* factors.

### (1)  *V Secret*'s Treatment of the *Nabisco* Test

AutoZone contends that we never expressly adopted the *Nabisco* test, instead preferring to leave the issue open for "further explication on a 'case-by-case' basis." AutoZone Br. at 12. AutoZone is partially correct. This court stated in *V Secret*:

We find that these factors effectively span the breadth of considerations a court must weigh in assessing a claim under the FTDA, from the inherent qualities of the marks themselves, to the behavior of the corporate entities in introducing a mark into commerce, to the highly practical and subjective considerations of the effect of the marks

on the actual consumers who will consider them, and find them persuasive to our analysis.

*V Secret*, 259 F.3d at 476. We agreed with the Second Circuit's statement that the ten-factor list was "nonexclusive" and was intended to "develop gradually over time and with the particular facts of each case." *Id.* (quotation omitted). *V Secret* was decided on the basis of only two *Nabisco* factors (distinctiveness and similarity). The other factors were not discussed in any depth thus leaving "further explication for later development gradually over time, on a case-by-case basis." *Id.* at 477 (quotation omitted). Therefore, AutoZone is correct that *V Secret* did not evaluate and apply all ten *Nabisco* factors. The opinion simply noted that the ten *Nabisco* factors represent a broad array of inquiries that can help a court assess whether dilution has occurred.

AutoZone is incorrect, however, when it claims that *V Secret* did not adopt the *Nabisco* test. *V Secret* explicitly adopted the general framework and thrust of the *Nabisco* inquiry, but it did so with the recognition that the test is variable and subject to both maturation and refinement. We imported the *Nabisco* test with the expectation that it would evolve. As the *Nabisco* court itself exhorted, "We make no suggestion that the factors we have focused on exhaust the test of what is pertinent. New fact patterns will inevitably suggest additional pertinent factors. . . . [N]o court should, at least at this early stage, make or confine itself to a closed list of the factors pertinent to the analysis of rights under the new antidilution statute." *Nabisco*, 191 F.3d at 228.

### (2) The Supreme Court and *Nabisco*

The Supreme Court's reversal of *V Secret* calls into doubt the continued vitality of the *Nabisco* test. Between the district court's grant of summary judgment and the parties' oral argument before us, the Supreme Court reversed *V Secret. See Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003) ("*Moseley*"). To resolve a circuit split, the

Supreme Court addressed the discrete issue of whether a dilution claim required proof of actual dilution or whether proof of a likelihood of dilution would suffice. *Id.* at 428; *see V Secret*, 259 F.3d at 476 (adopting likelihood of dilution standard); *Nabisco*, 191 F.3d at 223-24 (adopting likelihood of dilution standard); *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.*, 170 F.3d 449, 464 (4th Cir. 1999) (requiring proof of actual dilution). Analyzing the text of § 1125(c)(1), the Court held that the statute "unambiguously requires a showing of actual dilution, rather than a likelihood of dilution." *Moseley*, 537 U.S. at 433. Actual dilution "does not mean that the consequences of dilution, such as an actual loss of sales or profits, must also be proved." *Id.* However, "where the marks at issue are not identical, the mere fact that consumers mentally associate the junior user's mark with a famous mark is not sufficient to establish actionable dilution . . . [because] such mental association will not necessarily reduce the capacity of the famous mark to identify the goods of its owner, the statutory requirement for dilution under the [antidilution act]." *Id.* The Court recognized that proof of actual dilution may be difficult to obtain, although it noted that circumstantial evidence can be used to show actual dilution under certain circumstances, such as the "obvious" case when the marks are identical. *Id.* at 434. The Supreme Court reversed because the evidence was not sufficient to support summary judgment given the stricter standard adopted by the Court. *Id.*

Nothing in the Supreme Court's opinion in *Moseley* adressed the efficacy of the ten-factor test; the Supreme Court did not criticize the Second Circuit for creating the test or the Sixth Circuit for adopting it. The Supreme Court in essence made it more difficult for dilution claims to succeed because plaintiffs face a much higher hurdle of demonstrating actual dilution, but the Court was silent as to the manner in which courts must evaluate plaintiffs' success in overcoming that hurdle. This silence could imply that a test designed to measure likelihood of dilution may not be appropriate to

evaluate actual dilution, but we are left without firm guidance on the issue.

### (3) AutoZone's Failure to Present Evidence of Actual Dilution

We need not resolve whether the *Nabisco* factors may be useful in future cases because AutoZone here has presented no evidence of actual dilution.[3]  However, we note that several of the *Nabisco* factors are particularly *unhelpful* in cases such as this one.  Given that the FTDA authorizes dilution claims no matter whether there exists competition between the owners of the respective marks or whether there is a strong likelihood of confusion between the marks, the factors measuring "proximity of the products," *Nabisco*, 191 F.3d at 218-19, "shared consumers and geographic limitations," *id.* at 220, and actual confusion, *id.* at 221, seem irrelevant to the dilution analysis.[4]  Even Radio Shack

---

[3]Our sole post-*Moseley* dilution case did not explicitly cite to the *Nabisco* test when the plaintiff failed to provide evidence showing that actual dilution occurred. *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003).  In *Toucan Golf*, the plaintiff could not demonstrate that the defendant's use of its junior mark reduced consumers' association between the senior mark and Kellogg's products. *Id.*

[4]Other circuits have excluded these and certain additional *Nabisco* factors in analyzing dilution claims and adopted simpler tests. *See Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 468-69 & n.7 (7th Cir. 2000) (adopting a two-part test, which focused solely on similarity between the marks and renown of senior mark); *Luigino's, Inc v. Stouffer Corp.*, 170 F.3d 827, 832-33 (8th Cir. 1999) (adopting a two-part test that measures the similarity of the marks and whether consumers connect the defendant's product with the plaintiff's famous mark); *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 49-50 (1st Cir. 1998) (criticizing the *Nabisco* test's precursor, *Mead Data Cental, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1035 (2d Cir. 1989) (Sweet, J., concurring), and *Mead*'s use of certain factors that are also found in the *Nabisco* test, such as the similarity of products).  A leading commentator disapproves of the *Nabisco* test, believing that it fashions such a complex test that not only will few mark owners succeed in their dilution claims, but few will

---

conceded at oral argument that actual confusion is not a pertinent consideration.

No matter the remaining vitality of the *Nabisco* test, the district court properly granted summary judgment because AutoZone has not presented enough evidence of actual dilution such that there exists a genuine dispute of material fact for a jury to resolve.  Coupled with AutoZone's failure to provide any evidence that the PowerZone mark blurred the distinctiveness of the AutoZone mark, the dissimilarity between the two marks by itself demonstrates why AutoZone's claim cannot succeed.  The "similarity" test for dilution claims is more stringent than in the infringement milieu:

> The . . . test of similarity used in the traditional likelihood of confusion test cannot be the guide [for dilution], for likelihood of confusion is not the test of dilution.  For blurring . . . to occur, the marks must at least be similar enough that a significant segment of the target group of customers sees the two marks as essentially the same.  Blurring is one mark seen by customers as now identifying two sources.  But two different marks identifying two different sources is not blurring and will not cause dilution.

4 McCarthy § 24:90:2, at 24-160.  In *V Secret*, we considered it important that the "two marks in questions are *highly similar*." *V Secret*, 259 F.3d at 476 (emphasis added); *see*

---

even pursue dilution claims because the *Nabisco* test makes accurate predictions of victory difficult. 4 McCarthy § 24:94.4, at 24-211.  The same commentator urges that certain factors, such as the similarity of the products, the sophistication of consumers, and actual confusion, are not only irrelevant but also misinterpret the purpose of anti-dilution laws. *Id.* at § 24:94.4, at 24-211 to 24-214.  Nonetheless, at least one other circuit has not only adopted the *Nabisco* test, but also has expanded it. *See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 168-69 (3d Cir. 2000), *cert. denied*, 531 U.S. 1071 (2001) (adopting a sixteen-part test).

*also id.* at 476-77 (finding that "Victoria's Secret" and "Victor's Little Secret" are "semantically almost identical" and "graphically similar as well."). In *Jet*, we stated, "The purpose of anti-dilution laws is to provide a narrow remedy when the similarity between two marks is great enough that even a noncompeting, nonconfusing use is harmful to the senior user. . . . The degree of similarity required for a dilution claim must be greater than that which is required to show likelihood of confusion." 165 F.3d at 425. We held that because JET and AEROB-A-JET were not similar enough even to satisfy the likelihood of confusion test, the plaintiff's dilution claim could not succeed.[5] Despite AutoZone's contention that the level of similarity required is not higher in the dilution context, every federal court to decide the issue has ruled that a high degree of similarity, ranging from "nearly identical" to "very similar," is required for a dilution claim to succeed. *See Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 806 (9th Cir. 2002) (stating that marks must be "identical or nearly identical"); *Eli Lilly*, 233 F.3d at 469 (holding that HERBROZAC and PROZAC were "highly similar"); *Ringling Bros.*, 170 F.3d at 458 (requiring "a sufficient similarity between the junior and senior marks to evoke an instinctive mental association of the two" (quotation omitted) and affirming lower court's factual finding that GREATEST SHOW ON EARTH and GREATEST SNOW ON EARTH were not similar enough to sustain dilution claim); *Luigino's*, 170 F.3d at 832 (LEAN CUISINE and

---

[5]AutoZone protests that *Jet* is not relevant here because we applied the stronger similarity threshold only in the midst of a discussion of the Ohio state antidilution statute. However, *Jet* also evaluated the plaintiff's motion to amend its complaint to add a federal dilution claim under § 1125(c). In ruling that such an amendment would be futile, we spoke directly to the degree of similarity needed to succeed in a federal dilution claim: "[T]he federal dilution claim would fail because the marks are not sufficiently similar. Although some aspects of this claim would be different under the federal statute than under Ohio common law, *we would still require a greater degree of similarity than is needed under the likelihood of confusion test*." *Id.* (emphasis added).

LEAN 'N TASTY are not similar enough because the sight and sound of the marks are different and the common use of the word "lean" does not make the marks similar); *Nabisco*, 191 F.3d at 218 (stating that "[t]he marks must be of sufficient similarity so that, in the mind of the consumer, the junior mark will conjure an association with the senior," but not requiring that marks be completely identical); *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 50 (1st Cir. 1998) (adopting the standard that customers must view the marks as "essentially the same"). Following our precedent and the guidance of other circuits, we require a plaintiff to demonstrate a higher degree of similarity than is necessary in infringement claims in order to prove that actual dilution has occurred.

AutoZone's dilution claim must fail because the absence of a high degree of similarity between AUTOZONE and POWERZONE underscores AutoZone's failure to provide any evidence of actual dilution. Given that there is not even enough similarity between the two marks to demonstrate a likelihood of confusion, the marks are certainly not highly similar or nearly identical such that AutoZone can prove that actual dilution has occurred. The two marks look different; they are written in different fonts and colors. They utilize different designs (slanted versus nonslanted tradename) and are meant to convey different messages. They also sound different because there is little acoustic similarity between AUTO and POWER. As a comparison, AUTOZONE and a hypothetical AUDIOZONE would have a higher level of acoustic similarity. Additionally, the common word between AUTOZONE and POWERZONE is pronounced second and is consequently deemphasized.

Because we hold that AUTOZONE and POWERZONE are not similar enough to pass the higher threshold required to prove actual dilution, and because AutoZone has produced no other evidence of actual dilution, AutoZone cannot demonstrate that Radio Shack's use of POWERZONE caused

"dilution of the distinctive quality of the senior mark." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d at 628.

### c. Conclusion Regarding Dilution Claim

In sum, we affirm the district court's grant of summary judgment because there are no genuine issues of material fact regarding AutoZone's dilution claim. AutoZone failed to present evidence satisfying the fifth and ultimate factor in our five-part test for dilution. AutoZone also contends that because the Supreme Court altered the standard for dilution claims we must remand the case so that the district court can reevaluate its decision in light of *Moseley*. AutoZone's argument falls wide of the mark. *Moseley* raised the bar for dilution claims. If AutoZone failed in its efforts to show dilution under the more generous "likelihood of dilution" standard, it will not find success under a more stringent test. *See Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d at 628-29 (refusing to remand on account of *Moseley*'s change in the standard because we considered plaintiff's "proffered empirical evidence insufficient even to meet the lesser standard"). Furthermore, because we analyze the federal and Tennessee dilution claims in the same manner, AutoZone's failure to succeed in its federal claim also extinguishes its state dilution claim.

### III. CONCLUSION

We **AFFIRM** the district court's grant of summary judgment in favor of Radio Shack. AutoZone did not present any genuine issues of material fact regarding the likelihood of confusion between AUTOZONE and POWERZONE. Nor did AutoZone provide evidence that would allow a jury to conclude that the POWERZONE mark actually diluted the AUTOZONE mark. Under these circumstances none of AutoZone's claims can withstand Radio Shack's summary judgment motion. We **AFFIRM**.